UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Leif Spore and Brian Stark, | Civil File No. 13-cv-00649 SRN/JJG |
| Plaintiffs | |
| v. | **PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Dreyer's Grand Ice Cream, Inc. d/b/a Nestlé DSD Company | |
| Defendant | |

---

## INTRODUCTION

A Defendant's burden at summary judgment is to demonstrate that the Plaintiffs' evidence, taken as true and disregarding conflicting evidence, could never lead a jury to find in Plaintiffs' favor.  Defendant fails to meet this burden.  Plaintiffs Brian Stark and Leif Spore present evidence that their supervisors repeatedly said there were too many aging and long tenured workers in the company it purchased, and that the same managers ignored objective evidence of their good performance and determined to fire them prior to gathering "ammo" to support the decision to fire them.  Nestlé fails to demonstrate that no reasonable jury could find that age discrimination motivated its managers, and therefore, Nestlé's motion for summary judgment should be denied.

1

**FACTS SHOWING JURY QUESTION**

**Agan Was Alarmed At The Age And Tenure Of Managers**

Within weeks after Scott Agan took over as the General Sales Manager, he met with some of the DSLs (District Sales Leader "DSL") in his area. *Declaration of Leslie L. Lienemann dated August 1, 2014 ("Lienemann") Ex. 10, Spore Depo. pp. 176, 211-212; Ex. 11, Stark Depo. p. 206.* Spore and Stark recall Agan saying in that meeting that he was "alarmed" by the "age and tenure" in the room. *Lienemann Ex. 10, Spore Depo. pp. 176, 184, 226, 265; Ex. 11, Stark Depo. p. 202.* Human Resources manager Amanda Sorrento attended the meeting, but did nothing in response to the discriminatory statements. *Lienemann Ex. 10, Spore Depo. p. 177; Ex. 11, Stark Depo .pp. 202, 206.* Agan went on to say that he believed managers should not stay in any job more than five to seven years, and that managers should "move up or move out." *Lienemann Ex. 10, Spore Depo. pp. 184-186, 265; Ex. 11, Stark Depo. p. 298.* Agan's comments concerned Stark and Spore, both of whom had been in their positions more than twenty years. *Lienemann Ex. 10, Spore Depo. pp. 15, 17-18, 20, 27-28, 186-87, 211-212; Ex. 11, Stark Depo. pp. 23-25, 27, 35, 298.*

Minneapolis DSL Stacey Jackson (n/k/a Oien) testified that she also heard Agan's comment. *Lienemann Ex. 5, Jackson Depo. pp. 12-16.* Jackson was in her mid-forties at the time and was concerned for her job. *Lienemann Ex. 5, Jackson Depo. pp. 12-16.*

Comments about the age of the workforce were common after Agan came to Nestlé. *Lienemann Ex. 10, Spore Depo. pp. 97-98, 133-134, 169-184; Ex. 11, Stark Depo. pp. 202, 206, 298.* Lisa Sampson, who worked in a support staff position in the

Minneapolis office, testified she heard comments in the hallways about the "aging" workforce Nestlé had inherited from Kraft. *Lienemann Ex. 9, Sampson Depo. pp. 7, 9.* She was concerned for her job, because she was also in her fifties. *Id. at 7, 9.*

Stark and Spore both heard Safety, Health and Environmental Manager Ed Wozniak say repeatedly that older workers tended to be more easily injured, and directed the DSLs to "performance manage" out older or injured workers. *Lienemann Ex. 10, Spore Depo. pp. 15, 17-18, 20, 27-28, 186-87, 211-212; Ex. 11, Stark Depo. pp. 23-25, 27, 35, 298..* In January of 2012, Wozniak questioned Spore about the age of one of his direct reports, Becky Swain. *Lienemann Ex. 10, Spore Depo. pp. 276-77.* Swain had injured her knee, and was just shy of turning fifty-eight years old. *Id.* On a weekly call, Wozniak raised Swain's age as an issue and again commented about the older age of many Kraft workers. *Id.* Wozniak was worried about his safety record, and said that a younger work force would have fewer injuries. *Id.*

Former Area Sales Manager Kevin Moore testified that comments about the aging Kraft work force Nestlé bought from Kraft were common, and that age was perceived as a negative thing. *Lienemann Ex. 7, Moore Depo. pp. 10-14.*

**"Performance Manage" Out**

Human Resources Director of Field Operations Laurel Catlett-King testified that Nestlé had a performance management protocol, which included coaching, verbal and documented, then "PIP" (performance improvement plan) and then termination. *Lienemann Ex. 3, Catlett-King Depo. pp. 7, 16.*

At the time Agan took over the region, Stark and Spore were managed by Area Sales Leader Tom Kennedy, who had been their manager for many years. *Lienemann Ex. 10, Spore Depo. pp. 31, 42-46, 108; Ex. 11, Stark Depo. p 95.* Kennedy was over fifty. *Lienemann Ex. 10, Spore Depo. pp. 171-173; Exs. 28, 29.* Shortly after Agan arrived, Kennedy went out on a medical leave of absence. *Lienemann Ex. 1, Agan Depo. p. 31.* While Kennedy was on his medical leave, Agan contacted him and offered him a severance package. *Lienemann Ex. 1, Agan Depo. p. 32.* Kennedy never returned to Nestlé . *Id.*

In early September 2011, Spore became ill and required medical treatment for his lungs. *Lienemann Ex. 10, Spore Depo. pp. 208-209, 274-276, 280.* Agan confronted Spore at a meeting, during a break, and asked in a harsh tone whether Spore was "on restrictions." *Lienemann Ex. 10, Spore Depo. pp. 208-09, 296.* From Agan's tone, and having heard directions to "performance manage out" older employees with injuries, Spore was worried that his job was in jeopardy. *Lienemann Ex. 10, Spore Depo. pp. 138, 168-184, 206-07, 210-11, 214-17.* Spore assured Agan that he had no restrictions. *Lienemann Ex. 10, Spore Depo. p. 209.* Stark, having seen Agan pull Spore aside, stood in close enough proximity to witness Agan's intimidating demeanor toward Spore. *Stark Dec.¶ 15.*

Also in early September 2011, Agan confronted Wisconsin Area Sales Leader ("ASL") Kevin Moore. *Lienemann Ex. 7, Moore Depo. pp. 15-23.* With no advance notice, Agan told Moore that he was placing Moore on a "PIP." *Id.* Agan told Moore that his chances of surviving a PIP were very slim. *Id.* Agan told Moore that his options were

to risk the PIP, or to accept a severance package.  *Id*.  Moore accepted the severance package because he "saw the handwriting on the wall," and believed he would be fired. *Id. at 20-21*.  Moore was fifty-nine (59) years old and had been in his job for twenty-seven (27) years.  *Lienemann Ex. 7, Moore Depo. pp. 7, 36*.

Moore had supervised a Wisconsin DSL, Russ Averill.  *Lienemann Ex. 7, Moore Depo. pp. 22-23; Ex. 1, Agan Depo. p. 51*.  At the time Moore was given the options of risking the PIP or taking a severance package, Moore had no intention of placing Averill on a PIP, and he testified that Averill did not deserve to be placed on a PIP.  *Lienemann Ex. 7, Moore Depo. pp. 22-24*.  Within weeks after Moore was forced out, however, Agan placed Averill on a PIP.  *Lienemann Ex. 7, Averill Depo. pp. 8-9, 13-19; Ex. 1, Agan Depo. 54-56*.    As he had with Moore, Agan told Averill that he had little chance of surviving a PIP.  *Lienemann Ex 2, Averill Depo. p. 14*.  In fact, by October 16, 2011, Agan had identified Averill's termination date as immediate.  *Lienemann Ex. 13*.   After Agan assured Averill that he had little chance of surviving the PIP, Agan offered Averill a severance package, which Averill felt forced to accept.  *Lienemann Ex 2, Averill Depo. pp. 14-17*.  Averill was fifty-nine (59) years old and had been in the job thirty-one (31) years.  *Lienemann Ex. 2, Averill Depo. pp.6-7*.

In an email dated October 16, 2011, Catlett-King summed up the results of a meeting between herself, Area Manager Jeff Rausch (who was covering the Minneapolis area until Kennedy's replacement started) and Eric Yergens.  *Lienemann Ex. 13*.  In addition to Averill in Wisconsin, she identified three Minnesota DSLs who she expected to "exit" the company in 2012:  Stark, Spore and Dave Dahl, who was 56 years old.

*Catlett-King Dec.¶ 7; Lienemann Ex. 4, Catlett-King 74-80; Ex. 13*. In her deposition, she testified that it was Agan who identified the three DSLs who would likely leave in 2012. *Lienemann, Ex. 3, Catlett King Depo. p. 42*. They identified the following replacements: Katie Mislin, Tom Chodl and Megan Laughlin, all of whom were in the twenties or thirties. *Lienemann Ex. 3, Catlett-King 41-42, 74-60; Ex. 8, Rausch Depo. pp. 39-41*; *Ex. 13*. Agan acknowledged that none of the three—Stark, Spore or Dahl-- had given any indication that they intended to leave the company. *Lienemann Ex. 1, Agan Depo. pp. 81-84*.

In late October, Kenny Gilbert was hired to replace Tom Kennedy as the Minnesota ASL. Almost immediately, Gilbert began making comments to Stark and Spore about their age. Gilbert asked both Stark and Spore how old they were and how long they had been with the company. *Lienemann Exs. 28-29*. In December, 2011, Gilbert told Stark he "can't change." *Lienemann Ex. 11, Stark Depo. pp. 165-67, 299-300*. Gilbert told Stark that he would rather hire a younger manager right out of college. *Lienemann Ex. 11, Stark Depo. pp. 299-300*. Gilbert told Stark that an older, more experienced, manager could be trained but would not "maintain" because older employees had developed "too many bad habits." *Id*.

From the time Gilbert took over as the Minnesota ASL, he was verbally abusive to Stark and to Spore. *Lienemann Ex. 10, Spore Depo. p. 282; Ex. 11, Stark Depo. .pp. 166-67*. Lisa Sampson worked in the office next to Gilbert. *Lienemann Ex. 9, Sampson Depo p. 16*. She frequently heard Gilbert raise his voice at Stark and speak to him in a demeaning voice. *Lienemann Ex. 9, Sampson Depo p. 29*. She testified she could hear

Gilbert's raised voice through the wall. *Id.* She testified she heard Gilbert speak to in a demeaning voice were herself, Spore and Stark. *Id.*.

Sampson was hired by Tom Kennedy, but reported to Gilbert after he was hired. *Lienemann Ex. 9, Sampson Depo. p. 8.* A week after Gilbert started, Gilbert used the same demeaning tone with her that he used with Stark and Spore when he told her he did not think she was suited for the job. *Lienemann Ex. 9, Sampson Depo. pp. 9-10, 29.* He said, "I see the train going down the tracks one of two ways: Either I can keep you on for a while and you can look for a job, or I can—I'm gonna throw everything at you and what you can't do I'm gonna write you up for." *Id.* She believed he was trying to get her to quit. *Id. at 11.* He then gave her extra work to do, including compiling books full of information that he never reviewed. *Id. at 11-12.* Eventually, Sampson quit, taking a job that paid substantially less. *Id. at 26.*

A few weeks after Gilbert started, on November 16, 2011, he gave Stark and Spore their mid-year reviews, just six weeks prior to the end of the fiscal year. *Lienemann Exs. 14, 15, Ex. 10, Spore Depo. pp. 235-237, Ex. 11, Stark Depo. pp. 140-45.* In his deposition, Gilbert contended that he had not written the mid-year review. *Lienemann Ex. 4, Gilbert Depo. p. 52.* Jeff Rausch, who had been their interim manager in 2011 prior to Gilbert's hire, testified that he, with input from others, drafted the reviews, and that several of the criticisms in the rating section of Stark and Spore would apply equally to all DSLs. *Lienemann Ex. 8, Rausch Depo. 64-69.* Rausch also testified that his deposition, in 2014, was the first time he had heard of Stark or Spore being given "5" ratings on their end of year reviews based upon their mid-year reviews. *Lienemann*

*Ex. 8, Rausch Depo. pp. 91-92.*   However, Spore testified that he spoke with Rausch after Gilbert gave him his mid-year review, and Rausch had told him that he had not written any of the mid-year evaluations.   *Lienemann Ex. 10, Spore Depo. pp. 236-37.*   Stark testified that he also spoke with Rausch after Gilbert gave him his mid-year review, and Rausch also told him that he had written none of the mid-year evaluation. *Lienemann Ex. 11, Stark Depo. pp 91-93*.

Both Spore and Stark were upset by their mid-year reviews, because they contained criticisms that were untrue, and because they were given at the end of the year when there would be little time to make corrections.   *Lienemann Ex. 10, Spore Depo. pp. 235-260; Ex. 11, Stark Depo. pp. 140-167, 315-16.*   Both believed they were being "performance managed out." *Lienemann Ex. 10, Spore Depo. pp. 259-60; Ex. 11, Stark Depo. pp. 309-310*.

In an email dated December 15, 2011, Catlett-King objected to the hiring of Spore's daughter as a part time merchandiser, because she said Nestlé would be "moving on her father within a couple of months." *Lienemann Ex. 16.*  Catlett-King wrote, "…we should plan to place Leif on a PIP in conjunction with his end of year review—my guess is that you will have a fair amount of ammo for this document after your day in trade with Scott in early January."  *Id*.  In her deposition, Catlett-King denied that "ammo" meant ammunition, and denied that "moving on her father" meant terminating his employment. *Lienemann Ex. 3, Catlett-King Depo. pp. 124-25*.

Not waiting for the results of the market tour for Spore, however, Gilbert, Agan and Catlett-King prepared a succession plan to replace Stark, Spore and Dahl with

younger employees who had no management experience.  *Lienemann Ex. 13*.  Catlett-King drafted an attachment labeled "MN DSL Timing_Plan."  *Lienemann Ex. 17*.  The "Timing Plan" indicates that Nestlé's "Proposed Next Step" for Spore was "Exit."  *Id*.  It said, "PIP Timing" was "EOY Review."  It had a column for "Backfill timing," which Catlett-King testified meant the date on which a replacement would take Spore's job.  The date on the chart was "1-Apr."  The document listed Spore's temporary replacement as Brian Stark.  The email, however, indicates that the plan was to move Stark into Spore's position as a "temporary fill."  *Id*.  In the email, Catlett-King wrote, "We rated Stark as a 5 in the EOY review, but we don't seem to have an immediate exit plan for him.  Should we actually change this rating to a 4?"  *Id*.  It is clear from the document that a "5" rating indicates that Nestlé has an "exit plan" for the employee.  The PIP is treated as merely a next step.

In her deposition, Catlett-King testified that "exit" did not necessarily mean termination of employment.  *Lienemann Ex. 3, Catlett-King Depo. pp. 64-65*.  She did acknowledge, however, that she was unaware of any definition of "exit" that did not mean "to leave."  *Id*.  She testified that she had no idea who generated the April 1 date, and said it was just a "placeholder," despite the label of the document being "MN DSL Timing Plan."  *Id. at 68*.  With other employees, however, PIP dates were listed as N/A, or TBD, rather than a specific date.  Catlett-King offered no explanation for placing the "exit" date of April 1 next to Spore's name, as opposed to an N/A or a TBD.  *Id.*

At that time, Stark was not listed as receiving a PIP on the form, but the email made clear that giving him a "5" rating would mean "PIP" and "exit."  On February 6,

2012, however, Gilbert sent an email to Catlett-King confirming that he had told Stark he was on a PIP. *Lienemann Ex. 18*. From that time forward, no one ever indicated to Stark that he was not continuing to be on a PIP. *Stark Dec. ¶ 6*.

   In his deposition, Gilbert initially testified that by February 2012 he had not been in the position long enough to fairly evaluate Stark and Spore. *Lienemann Ex. 4, Gilbert Depo. p. 52*. His December 2011 emails, however, demonstrate that he had already recommended performance ratings of "5" for both of them. *Lienemann Ex. 3, Catlett-King Depo. pp. 50-60; Exs. 36, 37, 18, 20*. At that time, a "5" rating was the lowest performance rating, which would deprive Stark and Spore of any raise, and of substantial bonuses. *Lienemann Ex. 8, Rausch Depo. pp. 91-92; Exs. 19, 20, 37*. When confronted in his deposition with emails showing he had recommended "5" ratings for Stark and Spore less than eight weeks after starting his employment, Gilbert responded that he had had their mid-year reviews to work from. *Lienemann Ex. 4, Gilbert Depo. pp. 109-112, 37*.

   In order to gather "ammo" to support their decision to replace Stark and Spore with younger managers, Gilbert and Agan began conducting market tours. *Lienemann Ex. 10, Spore Depo. pp. 111, 117, 198, 218-19, 228-230, 272-273; Ex. 11, Stark Depo. pp. 230,259-260, 298-99, 302; Exs. 28, 29*. Stark and Spore were given little or no notice of their market tours, and their market tours were conducted during high volume times when it is difficult to keep product in stock. *Lienemann Exs. 28, 29*.

   In December, 2011, Agan planned to travel to Minneapolis to perform market tours of Stark and of DSL John Compton. *Stark Dec. ¶ 9*. Agan notified Stark and Compton at the same time, giving Stark less than one day's notice. *Id*. Stark asked

Gilbert to switch his tour with Compton's because Stark's granddaughter was scheduled to be delivered on that day and the family had been notified that the child suffered from spinal bifida and might suffer complications. *Id.* Gilbert refused to reschedule, saying that Agan wanted it done that day. *Id.* The result was that Stark had no ability to prepare for the tour, while his co-hort had two days to prepare, and Stark was on a market tour, rather than at the hospital with his family. *Id.*

Prior to Spore's market tour in January 2012, Spore asked his manger, Kenny Gilbert, what materials Agan might want to see during the tour, so he could properly prepare. *Spore Dec. ¶ 6.* Spore had never been subjected to a market tour, so he did not know what to expect. *Id.* Gilbert told him he did not need to prepare materials, given that the market tour was being done on short notice. *Id.* Although Gilbert had known of the market tour for nearly six weeks because he had received a copy of Catlett-King's December 15, 2011 email stating that Nestlé wanted to gather "ammo" on Spore to support "moving" on him, Gilbert waited until a few days before the tour to notify Spore. *Id.* During the market tour, Agan began demanding to see various information. *Id.* When Spore did not have the requested information readily at hand, Agan began verbally berating him. *Lienemann Ex. 10, Spore Depo. pp. 148-49, 230-33; Spore Dec. ¶ 6.*

Despite Agan's negative demeanor, Agan did not give Spore any written feedback from the market tour. Spore met with Gilbert on February, 2, 2012, however, and read Agan's comments from his phone. *Spore Dec. ¶ 7.* Gilbert told Spore that generally the market tour had gone well, said that Spore was well connected with the community and the store personnel, and said that Spore's round table had gone very well. *Id.*

11

In the same meeting, however, after telling Spore that his market tour and round table reviews had gone well, Gilbert told Spore that Agan said Spore was not cut out to be a DSL. *Spore Dec. ¶ 7.* Gilbert said they were putting Spore on a PIP, and that a PIP was the next step to termination. *Lienemann Ex. 28.* Gilbert said Spore had a very slim chance of surviving the PIP. *Spore Dec. ¶ 9.* Gilbert told Spore he seemed well connected in his area and should weigh his options. *Spore Dec. ¶ 7.* Spore asked Gilbert whether he meant Spore should be looking for another job. *Spore Dec. ¶ 7.* Gilbert said, "Yes." *Spore Dec. ¶ 7.* Gilbert went on to say that Spore did not have the "skill set" to be a DSL. *Spore Dec. ¶ 7.* When Spore asked what skill set he lacked, Gilbert identified none. *Spore Dec. ¶ 7.*

After Gilbert told Spore he was going on a PIP and had little chance to survive the PIP, Spore was so distraught over the threat to his job that he suffered a break down on the way home and admitted himself to the hospital for psychiatric care. *Spore Dec. ¶ 9.* He wrote notes in the hospital as a form of therapy, and wrote the things he had experienced at work. *Spore Dec. Ex. 1.*

When he notified Nestlé's benefits coordinator that he needed a medical leave, he told her he had been hospitalized as a result of being belittled to the point of hospitalization and depression. *Lienemann Ex. 21.* She recorded on her intake form, "EE was told that he not have the skill sets to be a DLS (sic). He was told that he was known in the community so you (sic) should consider your options and this was repeated several time(s) and then he was asked about his age and how many years with the

company.  EE stated that he was encouraged to look for another job. …" *Id.*  Nestlé's
benefits coordinator forwarded the information to Nestlé . *Id.*

Despite knowing that Spore was on a leave of absence to care for his mental health
due to Gilbert's conduct, Gilbert contacted Spore while on leave.  *Lienemann Ex. 10
Spore Depo. pp. 325-326; Ex. 20.*  Gilbert contacted Spore to go over his performance
rating which was a "5" rating, and  therefore would receive no bonus.  *Id.*  This contact
was extremely upsetting to Spore, who wondered whether Gilbert was intentionally
trying to cause him more harm. *Spore Dec. ¶ 11.*

On March 8, 2012, Stark was notified that he would receive a "5" rating and
would not receive a bonus, which would have been over $10,000.  *Lienemann Ex. 19.*

At the time their "5" ratings were issued, Stark and Spore's objective performance
numbers were as good as or better than their younger peers.  For example:  Agan had
developed "dashboard" performance measures, which listed targets for each territory.
*Lienemann Ex. 11, Stark Depo. pp. 83-84;Stark Dec. ¶ 16; Lienemann Exs. 38, 39.*  In the
last week of February, 2012, the month Nestlé had pre-determined to give Stark and
Spore "5" ratings and PIPs in conjunction with their end of year reviews, the results for
the Minnesota Area showed that Spore had the highest "Month-to-Date vs. Target"
performance in the area, with 97%, and Stark had the second highest, with a score of
94%. *Lienemann Ex. 22.*

Nestlé had also implemented a "D4G" performance measuring system in 2011.  In
November 2011, the month prior to Agan and Gilbert deciding to give Stark a "5" rating,
Stark was at or above 100% to goal in every category on the D4G.  *Lienemann Ex. 23.*

On the Minnesota Area's "DSL Performance" summary for 2011, Spore was 4.2% above prior year sales and 3.1% above plan for combined ice cream and pizza sales. Although the same document shows that Stark was slightly below his plan at -3.2%, younger DSLs had greater losses, but were not given "5" ratings, not given PIPs and not identified for "exit." For example, DSL Patrick Grimm was -21.9 to plan; John Compton was -4.2% to plan; David Schmisek was -3.8% to plan. *Lienemann Ex. 24*. None of these DSLs were being "performance managed out."

While Spore was on leave, Gilbert informed Stark that he was being placed on a PIP. *Lienemann Ex. 20*. Gilbert confirmed to Jillian Jaynes and Catlett-King that he had told Stark he was being placed on a PIP. *Lienemann Ex. 18.* As a result of Gilbert's badgering, being placed on a PIP and deprived of his bonus, Stark also began suffering distress and anxiety. *Lienemann Ex. 10, Stark Depo. pp. 262-63*. On March 9, 2012, after receiving an email from Gilbert, Stark began experiencing symptoms of anxiety, including crying and a racing heart. *Stark Dec. ¶ 12.* After his wife found him sobbing in their home, she drove him to the urgent care fearing for his health, and insisted he quit. *Stark Dec. ¶ 12.* Stark sent an email constructively discharging his employment because of age discrimination. *Lienemann Ex. 11, Stark Depo. pp. 187-190*; *Ex. 25.* Stark's email was sent after 5:00 p.m. on March 9, 2012. After Catlett-King received Stark's letter of constructive discharge on March 9, 2012, she called Spore at home, even though he was on leave. *Lienemann Ex. 10, Spore Depo pp. 304-07; Ex. 4 Catlett-King Depo. pp. 161-62.* Spore refused to speak with her. *Id.*

On March 16, 2012 Catlett-King sent an email to David Tredo, Nestlé Human Resources, saying, "…the NCR encountered a little um…hiccup…with performance ratings this year," *Lienemann Ex. 26*.  She then identified Spore and Dahl as employees whose "5" ratings would be changed to "3" ratings as a result of the "hiccup."  *Id.*  When Jillian Jaynes learned that Spore's rating had been changed to a "3", her response was, "risk-averse (sic) in the extreme."  *Lienemann Ex. 27.*

Prior to Spore's return to work from his medical leave, both Stark and Spore filed charges of discrimination with the EEOC and the Minnesota Department of Human Rights alleging age discrimination.  *Lienemann Exs. 28 and 29*.  At the time of their charges, neither had received their APEX bonuses.  *Lienemann Exs. 28, 29, Lienemann Ex. 10, Spore Depo. p. 297; Ex. 11, Stark Depo. pp. 127, 224; Spore Dec. ¶ 13.*

**Retaliation for EEOC charge**

Spore returned to work at the end of April 2012, approximately two weeks after filing his EEOC/MDHR charge alleging discrimination.  Immediately upon his return to work, Nestlé began retaliating against him in an effort to entice him to take an "opt out" or quit.

In May, 2012, Nestlé reduced its sales force, which resulted in the elimination of one DSL in the metro area.  In this reduction in force, Nestlé offered an "opt-out" to the DSL in the metro with the most seniority.  Spore had never before been considered part of the Metro area. *Lienemann Ex. 10, Spore Depo. pp. 284-85; Ex. 4 Gilbert Depo. p. 120.*  Catlett-King, however, sent an email directing that the conference call to be held with DSLs impacted by the reduction in force was to include "MSP + Leif".  "MSP"

referred to Minneapolis St. Paul DSLs, which Leif was not. *Lienemann Ex. 30.* The same email stated that the final territories had not yet been decided.

On May 19, 2013 Gilbert informed Spore he was being given a new district. *Spore Dec. ¶ 13.* The new position left Spore with 11 full time and 10 part-time reps under his supervision. *Id.* In addition to his prior territory in St. Cloud, Gilbert gave him a "super route" that covered an area that was a large format in the metro. *Lienemann Ex. 10, Spore Depo pp. 285-86; Spore Dec. ¶ 13.* A "super route" is a sales route that includes large high volume stores that require a great deal of time. *Id.* Spore's new area jumped over another "super route" that covered Elk River, Monticello and Buffalo, which are only within 30 minutes of where Spore lives. *Spore Dec. ¶ 13.* Gilbert informed him that this additional territory would be 56% of his total volume. *Spore Dec. ¶ 13.*. Gilbert told Spore that one sales rep who was assigned to Spore "does ok," another sales rep was "struggling and the customers are upset." *Spore Dec. ¶ 13.* Gilbert told Spore that the territory was "not in great shape." *Spore Dec. ¶ 13.*

The newly assigned territory stretched from Grand Forks to Bemidji, through central Minnesota, all the way to downtown Minneapolis. *Spore Dec. ¶ 13.* This geographical territory was far greater than those assigned to younger sales reps. *Spore Dec. ¶ 13.* The new territory added tremendous new responsibilities and increased Spore's number of direct reports. *Spore Dec. ¶ 13.*

It was impossible to handle all of this territory while still performing all of the responsibilities of the DSL position. *Spore Dec. ¶ 13.* No other DSL had this amount of

16

responsibility, especially given the vast geographical territory Spore was required to manage. *Spore Dec. ¶ 13.*

After doubling Spore's workload after receiving his EEOC charge, Gilbert demanded that Spore spend 70 percent of his time in metro region, which meant he had to cover this rest of his vast new territory in less than half of his time. *Spore Dec. ¶ 14.* Spore was aware that Gilbert once threatened another employee, Lisa Sampson, telling her that he would give her so much work to do that she would not be able to overcome it. *Id.*

Had Nestlé not given Spore the new metro route, Spore would not have been among the DSLs in the metro area where the reduction in force of one was to occur. *Lienemann Ex. 4, Catlett-King Dep. pp. 184-88; Exs. 30, 40.* Once Nestlé added Spore to the metro area, Spore had the most seniority. *Lienemann Ex. 4, Catlett-King Dep. pp. 184-88; Exs. 30, 40.* Nestlé offered Spore the "opt-out," which was a severance package that would have required him to sign a release of claims. *Lienemann Ex. 10, Spore Depo. pp. 284-286; Spore Dec. ¶ 10.* He refused. *Id.*

Nestlé's emails reflect that Jillian Jaynes emailed Catlett-King to confirm that Spore had been on the conference call when the reduction in force and the "opt-out" option were discussed with the metro DSLs. *Lienemann Ex. 31.* In June 2012, July 2012 and again in May 2013, Jaynes emailed Catlett-King confirming that she had several times offered the "opt out" to Spore, but he refused. *Lienemann Exs. 31 and 32.* In her deposition, Jaynes claimed not to remember why she sent the emails. *Lienemann Ex. 6 Jaynes Depo. pp. 126-30.*

17

**Nestlé's Misrepresentations**

Nestlé's memorandum makes several material misrepresentations of the record, including the following:

\*        Nestlé represents that Stark was not placed on a PIP:  Gilbert gave Stark a memo saying he was going on a PIP.  *Lienemann Ex. 34.* Gilbert sent a confirmatory email to HR saying he had told Stark he was on a PIP and copying HR on the memo saying he was on a PIP.  *Lienemann Ex. 18.*  No one ever told Stark he was no longer on a PIP.  *Stark Dec. ¶ 6.*  When Stark applied for another Nestlé job and asked Gilbert how his PIP would impact the new job, Gilbert did not indicate that Stark was not on a PIP. *Stark Dec. ¶ 7.*

\*        Nestlé represents that the DSL job duties changed when Nestlé took over from Kraft, based upon deposition testimony of Agan and Catlett-King:  Neither Agan nor Catlett-King ever worked for Kraft, and were hired by Nestlé in 2011, well after Nestlé purchased Kraft.  *Stark Dec. ¶ 2; Lienemann Ex. 1, Agan Depo. pp. 22-23; Ex. 3, Catlett-King Depo. pp. 6-7.*   Stark and Spore had the same job functions with Kraft as they had with Nestlé .  *Stark Dec. ¶ 2.*

\*         Nestlé represents that Stark's mid-year performance was "below expectations for a DSL" in the areas of "safety and people leadership":  Nestlé's emails show that Catlett-King asked Safety Manager Wozniak for information on Stark, Spore and Dahl at the same time Agan identified the three managers as DSLs who would be leaving the company in 2012. *Lienemann Ex. 35.*  Wozniak indicated he had no concerns with Stark.  *Lienemann Ex. 35.*  Stark's mid-year evaluation included a section for safety

18

issues, and in fact indicated that injuries were down from prior year and the area was DOT compliant.  *Lienemann Ex. 15*. The only specific criticism in the area of "people leadership" was a reference to D4G 1 with 1 and "work-withs."  *Id.*  Results for October, the last full month prior to the November 16 mid-year evaluation date, show that Stark was 256% to goal on 1 with 1 and 150% on "work with," far higher than any other Minnesota DSL  *Lienemann Ex. 29 at S08145*.  Furthermore, Jeff Rausch testified that the criticisms in the mid-year summary would likely apply to all DSLs at that time. *Lienemann Ex. 8, Rausch Depo. 64-69.*

        *        Nestlé represents that Spore's mid-year performance was "below expectations for a DSL" in the areas of "safety and people leadership":  The entire paragraph entitled "Manager's Overall Assessment" is identical to the paragraph appearing in Stark's review.  *Compare Lienemann Ex. 14 and Ex.15.*  Only the names are changed.  The same reference to D4G 1 with 1 and "work-withs" that appeared in Stark's review appeared in Spore's.  Results for October, the last full month prior to the November 16 mid-year evaluation date, show that Spore was 119% to goal on 1 with 1 and 75% on "work with."   *Lienemann Ex. 29 at S08145.* At the time Nestlé had trained the Minnesota DSLs on how to document their work on the D4G system, Spore had been assigned to Oklahoma City to assist Nestlé with a troubled area there.  *Spore Dec. ¶ 3.* Because he was not trained, he was unaware that any time he spent working with sales representatives should be entered as a "Work with" for D4G purposes, and that no formal process or meeting was required.  *Spore Dec. ¶ 4.*  This made his numbers artificially low.  Even then, two other area DSLs, Blake Enockson and Roger Burg had the same or

lower scores in this area.  *Lienemann Ex. 29 at S08145.*  Furthermore, Jeff Rausch testified that the criticisms in the mid-year summary would likely apply to all DSLs at that time.  *Lienemann Ex. 8, Rausch Depo. 64-69.*

\*      Nestlé's memorandum argues that it responded to Spore's concerns about discrimination and retaliation by removing the super route from his territory.  Spore complained about retaliation in 2012**.**  Nestlé removed the super route from his territory in May of 2014 due to a redistricting of the Minnesota area caused by the retirement of another DSL. *Spore Dec. ¶¶ 15-17.*  Further, even after the 2013 redistricting, Spore still has the largest territory and still has the most employees reporting to him. He has 18 direct reports.  *Spore Dec. ¶¶ 16-18.*  Chodl, the young manager who replaced Stark, has 8.  *Spore Dec. ¶ 18.*  Given Nestlé's expectation that DSLs conduct 1 with 1 and work with sessions with each direct report, having a larger geographical territory and a larger number of direct reports means having a larger work load.   *Spore Dec. ¶¶ 17-18.*

\*      Nestlé represents that all DSLs have had to undergo market tours.  That is not the case.  Spore is aware of two DSLs in North Dakota and one in Iowa who have never undergone a market tour with Agan.  *Spore Dec. ¶ 8.* Minnesota DSLs have commented to Spore that they believe his complaint of discrimination is the reason they have had to undergo market tours.  *Id.*

\*      Nestlé's memorandum repeatedly asserts that "there is no dispute" that Nestlé never intended to terminate the employment of Stark and Spore.  Nestlé's own emails and "MN DSL Timing Plan" identify the "proposed next step" for Spore as "exit" with a termination date of April 1.  *Lienemann Exs. 17; 28.*  Gilbert told Spore he was

going to be placed on a PIP and that PIP was the "next step" toward termination.  *Spore Dec. ¶¶ 5, 7.*  Nestlé's emails state that Stark was getting a "5" and indicate that a "5" would indicate an "exit strategy." *Lienemann Ex. 17*  Nestlé's email states that Stark would temporarily fill in for Spore after Spore's "exit" and then Stark would be terminated  *Id.* Gilbert told Stark he was going on a PIP, which was the next step toward termination, and that he had little chance of surviving a PIP.  *Stark Dec. ¶ 6, Ex. 29.*

**ARGUMENT**

**I.     Court Must Disregard Defendant's Evidence at Summary Judgment.**

On a motion for summary judgment, the defendant's evidence should be discarded, because the standard for summary judgment is like the standard for judgment as a matter of law at trial.  *See, e.g., Kinserlow v. CMI Corp.*, 217 F.3d 1021 (8th Cir. 2000); s*ee, also., Byrd v. Hall*, 847 S.W.2d 208, 210-211(Tenn. 1993)("In determining whether or not a genuine issue of material fact exists for purposes of summary judgment, courts in this state have indicated that the question should be considered in the same manner as a motion for directed verdict made at the close of the plaintiff's proof, i.e., the trial court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence.")(citing, *Downen v. Allstate Ins. Co.,* 811 S.W.2d 523, 524 (Tenn.1991); *Poore v. Magnavox Co.,* 666 S.W.2d 48, 49 (Tenn. 1984);  *Dunn v. Hackett,* 833 S.W.2d 78, 80 (Tenn. App. 1992); *Wyatt v. Winnebago Industries, Inc.,* 566 S.W.2d 276, 279 (Tenn.App.1977); *Taylor v. Nashville Banner Pub. Co.,* 573 S.W.2d 476, 480 (Tenn. App. 1978)).

When a motion for judgment as a matter of law is brought at the close of the plaintiff's case at trial, the Court looks at the evidence submitted by the plaintiff and determines whether a jury, if it believes plaintiff's evidence, could reasonably rule in plaintiff's favor.  *See, Fed. R. Civ. P. 50*.  On a motion for judgment as a matter of law, the court may only "give credence" to evidence favorable to the non-movant, and may not weigh the evidence.  *See, Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 150 (2000).  Summary judgment motions should be treated in the same manner.

At summary judgment, a court may not weigh plaintiff's evidence against defendant's evidence. Summary judgment should be denied if a jury, crediting plaintiff's evidence and disregarding defendant's evidence, could find in plaintiff's favor.  This standard was recently reiterated by the United States Supreme Court in *Tolan v. Cotton,* ___ U.S. __; 134 S. Ct. 1861 (2014).  In *Tolan*, the Supreme Court reversed the grant of summary judgment because the lower court credited defendant's evidence.  *Id.* at 1867-68. The court cautioned that:

> Witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases.  It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inference should be drawn in favor the nonmoving party.

*Id*. at 1868.

A summary judgment movant's burden is not merely to demonstrate that a jury *could* find in its favor, but rather to set forth evidence which *necessarily negates any possibility* that a plaintiff may prevail.  The summary judgment standard for employment

cases is no different than the summary judgment standard for cases alleging other wrongs.   The standard is properly demonstrated in the case of *McCarley v. West Quality Food Service*, 960 S.W.2d 585 (Tenn. 1998).   In that case, a plaintiff sued a KFC restaurant alleging that he suffered salmonella poisoning after eating chicken from the restaurant.   A lower court granted summary judgment based upon the restaurant's argument that the plaintiff had eaten bacon and eggs for breakfast on the same day he ate the restaurant's chicken for lunch, and therefore could not prove that the food poisoning was caused by the chicken, rather than the eggs or bacon. The Supreme Court reversed the grant of summary judgment.  It held that, while the defendant may argue that the eggs or bacon caused the illness, and even cast doubt as to whether the chicken caused the illness, that evidence "does not negate the chicken from the list of possible causes."  *Id*. at 588.   Accordingly, the court held that the issue of causation should be resolved by the jury.

Applying the same standard to a discrimination case, at summary judgment, an employer may not merely suggest other reasons for an adverse employment action, and may not merely cast doubt on whether discrimination motivated the employment action. Rather, the employer must *negate* discrimination from the list of possible reasons for an employer's conduct.  In short, so long as the chicken is one possible cause of food poisoning, the jury determines whether the chicken or the eggs caused the illness; and so long as discrimination is one possible explanation for an adverse employment action, the jury determines whether discrimination or some other factor more likely motivated the employment action.

23

Furthermore, the court in *McCarley* held that the lower court had incorrectly focused on the non-movant's opposition to the motion for summary judgment. It held that, "Because KFC failed to negate a basis of the [plaintiff's] claim, the [plaintiff's] burden of production was never triggered. *Id* at 589. The same should be true in the employment context. If the employer does not negate the possibility that discrimination motivated the employment action, the plaintiff's burden of production in response to a summary judgment motion is not triggered.

## II.   Nestlé Does Not Dispute Evidence Of Discrimination

Nestlé's motion is a narrow one. Nestlé seeks summary judgment based solely on the argument that it took no adverse action against Stark or Spore. Nestlé does not argue that it is entitled to summary judgment on any other basis. It is a defendant's burden to demonstrate in its opening brief the reasons it claims to be entitled to judgment as a matter of law. Should the Court reject Nestlé's argument that there is no evidence of adverse employment action, Nestlé's motion fails. Nestlé may not, in its reply brief or at oral argument, raise other bases for its motion.

Nestlé acknowledges the existence of direct evidence of discrimination. Presumably, Defendant would therefore concede that the Court should not apply the three-step *McDonnell Douglas* analysis. In addition, Nestlé does not argue that the direct evidence presented by Stark and Spore does not raise a genuine issue for trial on the question of whether Nestlé's actions were taken against Stark and Spore because of their age. Therefore, the only question before the Court is whether, crediting Plaintiff's

24

evidence and discrediting the Defendant's evidence, a jury could find Nestlé's conduct to be adverse employment actions.

### III.    Jury Could Conclude Stark and Spore were "Performance Managed Out"

A jury could conclude that Agan started with the presumption that older managers with long tenure should be "performance managed" out of Nestlé .  Agan said he was alarmed at the age and tenure of the Minnesota DSLs.  Agan identified Stark and Spore, along with Dahl (who was also over fifty and had long tenure) for termination in 2012 prior to completion of their mid-year reviews, prior to the completion of their year-end reviews, and prior to placing them on a PIP, which Catlett-King identified as part of the "performance management" system.

Catlett-King, Gilbert and Agan determined in December of 2011 that Stark and Spore would be replaced by younger managers.  These Nestlé managers determined that PIPs would be given to Stark and Spore in conjunction with their year-end reviews, and identified their "exit plan" for them prior to the PIPs being issued, and prior to conducting the market reviews that were supposed to justify the PIPs.

Further, evidence of Agan's pattern of threatening employees with PIPs, telling they had little chance of surviving the PIP and then offering them severance to leave is evidence upon which  jury could find that Agan was "performance managing" out older long-tenured employees.  Gilbert followed the very same pattern with Spore and Stark. He told each that they were being placed on a PIP, and told them they had little chance of

25

surviving the PIP.  He followed his PIP threats with statements encouraging Stark and Spore to look for other work.

Gilbert's comments about preferring younger managers, and believing older managers had "bad habits" and could not maintain are further evidence that he was trying to force Stark and Spore out.

In addition, the objective evidence demonstrates that Stark and Spore were performing as well as, or better than, their peers who were not identified for "exit" on the "DSL Timing Plan."  When objective evidence of performance contradicts subjective negative performance reviews, a jury can conclude that the negative performance reviews are discriminatory and are designed to facilitate termination.

A jury could conclude from the totality of the evidence that Agan and Gilbert preferred younger managers and "performance managed" Spore and Stark to facilitate hiring younger managers, which they did once Stark constructively discharged his employment.  Nothing in Nestlé's submission demonstrates that discrimination is not one rational conclusion from this evidence.  For this reason, Nestlé's motion is not properly supported and the burden does not shift to Stark and Spore to rebut the motion.

### IV.Adverse Action Defense Fails

Despite strong evidence of age discrimination, Nestlé argues that neither Stark nor Spore can prevail on an age discrimination case because they cannot show "adverse action."   Nestlé's brief ignores the facts supporting Plaintiffs' arguments, which a Defendant cannot do at summary judgment.  The Court must determine whether the evidence, if the jury credited the evidence of Stark and Spore, and discredited the

evidence of Nestlé , would permit a jury to find that Stark and Spore were discriminated against.

The Court of Appeals for the Eighth Circuit has long held that actions short of termination are "adverse actions."   Threats of termination are adverse employment actions. *See, e,g, Black v. Independent School Dist. No. 316*, 476 F. Supp. 2d 1115, 1123 (D. Minn. 2007). Papering a file in order to fire an employee is also an adverse action. *See, e.g., Montandon v. Farmland Industries, Inc.,* 116 F.3d 355, 359 (8th Cir. 1997); *Kim v. Nash Finch Co*., 123 F.3d 1046, 1060 (8th Cir. 1997). Under Title VII, an adverse employment action is one that causes a material change in the terms or conditions of employment, such as a termination, a constructive discharge, a cut in salary or benefits, or a change that affects an employee's future career prospects. *See, e.g., Miles v. Northcott Hospitality Intern., LLC,* 963 F. Supp.2d 878 (D. Minn. 2013), citing *Clegg v. Ark. Dep't of Corr.,* 496 F.3d 922, 926 (8th Cir.2007).

Nestlé's emails prove that Nestlé had identified Stark and Spore for termination— or "exit" by April of 2012, and sought "ammo" to support giving them "5" ratings and "PIPs".   Agan identified both Stark and Spore to leave the company as early as October 2011—before their mid-year evaluations were complete.  Both Spore and Stark testified that Gilbert told them they were going to be placed on a "PIP," with little chance of survival.  Gilbert told them both directly to look for other work.  These threats of termination are adverse actions, without more.

In addition, Stark constructively discharged his employment.   Under the Minnesota Human Rights Act, a constructive discharge is a "resignation which is caused

by illegal discrimination." *Danz v. Jones,* 263 N.W.2d 395, 403 n. 4 (Minn.1978). " 'A constructive discharge occurs when an employee resigns in order to escape intolerable working conditions caused by illegal discrimination.' " *Navarre v. South Washington Cnty. Schs.,* 652 N.W.2d 9, 32 (Minn.2002) (quoting *Continental Can Co. v. State,* 297 N.W.2d 241, 251 (Minn.1980)). To establish a constructive discharge, a plaintiff must prove that the employer's illegal discrimination created intolerable working conditions and that the employer either intended to force the employee to quit or could have reasonably foreseen that its conduct would force the employee to quit. *See*, *Pribil v. Archdiocese of St. Paul & Minneapolis,* 533 N.W.2d 410, 412–13 (Minn. App.1995).

In *Miles,* this court denied summary judgment, finding the plaintiff had made a *prima facie* showing of a constructive discharge. Evidence included the following: she was subjected to badgering, her supervisor made sexist comments and repeatedly yelled at her, her supervisor forced her to write a false performance action plan, management knew of the conduct, and in addition, after learning of the plaintiff's disability, her manager stated she should quit and removed her from extra projects. *See, Miles*, 963 F. Supp.2d at 893, 896. This court held that these facts, if proven at trial, could lead a reasonable jury to find that the plaintiff suffered an adverse employment action due to her disability.

Agan had a pattern of placing older managers on "PIPs", telling them they had little chance of surviving the PIP, and then offering to allow them to quit in exchange for severance. Gilbert echoed the same refrain, telling Stark and Spore they were being placed on a PIP, telling them they had little chance of surviving a PIP, and then telling

them they should be looking for other work.  Agan, Catlett-King and Gilbert identified Stark and Spore for "exit," and succeeded in threatening Stark to the point where he quit, which was their pattern and intent.

In addition, Agan, Wozniak and Gilbert made repeated discriminatory comments about older workers generally, about preferring younger workers, about performance managing out older workers and specifically asked Stark and Spore about their age and tenure.  Gilbert also yelled at Stark and Spore and spoke to them in a demeaning tone, which Lisa Sampson heard.  The culmination of the false performance appraisals, being told they would not receive their substantial bonuses, Gilbert's harassing demeanor, the many age related comments, the PIPs and other conduct described above caused both Stark and Spore to seek medical attention for their psychological well-being.  A jury could find Stark's forced retirement to be a constructive discharge.

Spore also suffered the same adverse employment actions that Stark did.  Nestlé asks the Court to focus on the fact that Spore returned to work after his medical leave and did not constructively discharge his employment.  That argument would suggest that discriminatory conduct by an employer sufficient to constitute adverse employment action is only illegal if the employee actually quits, regardless of the reason the employee did not quit.  Here, the only reason Spore returned to work rather than constructively discharging his employment was that he was supporting his daughter and her family after his son-in-law became ill.  *Spore Dec. ¶ 10.*   Spore has been searching for comparable employment since Gilbert told him to do so.  *Spore Dec. ¶ 5*  Unfortunately for Spore, he

has found that positions open in the current marketplace generally do not have comparable pay. *Lienemann Ex. 10, Spore pp. 257-60.*

There is no dispute that Nestlé's conduct caused Spore sufficient emotional anguish to result in his hospitalization. The fact that Nestlé , being "risk averse in the extreme" after learning of Stark and Spore's discrimination charges, reversed its discriminatory employment evaluation and gave Spore back his bonus does not address the harm the discrimination caused Spore.

The Minnesota Human Rights Act prohibits all discrimination "against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities or privileges of employment." *See*, Minn. Stat. §363A.08, Subd. 2. Defendant's argument focusses solely on the argument that Spore lost no compensation. The terms and conditions of Spore's employment, however, put him in the hospital. This evidence is sufficient to constitute discrimination under the plain language of the MHRA.

Nestlé has failed to carry its burden to show that no jury could conclude that Nestlé's conduct toward Stark and Spore constituted adverse actions.

**V.      Judgments of Credibility and Weight of Evidence Are For the Jury.**

At summary judgment, the Court may not choose to believe Defendant's evidence, and reject the Plaintiffs' evidence. Nestlé's managers may now, in the face of litigation, attempt to recast their email communications and suggest that it was not their intent to force Stark and Spore out of the company. The Court may not credit this testimony, however. A jury must weigh the current testimony of Nestlé managers against their contemporaneous emails.

**Nestlé Retaliated Against Spore**

Nestlé does not dispute that it received Spore's charge of discrimination.  It does not make any argument that there is a lack of "causation" between Spore's protected conduct and the alleged adverse employment actions.  Again, Nestlé's motion is a narrow one, arguing only that there was no adverse action.  Therefore, if the court finds evidence upon which a jury could find that Nestlé took adverse action against Spore, it must deny this motion.

Under the Minnesota Human Rights Ac, a reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment.  *See,* Minn. Stat. §363A.15.  Spore need not show that he was constructively discharged or suffered monetary harm in order to show that he suffered retaliation.

The Supreme Court has explained that "adverse action" for purposes of retaliation means only that the action would deter a reasonable person from reporting discrimination. *See, Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006)  In *White,* the change in an employee's schedule was sufficient to constitute an adverse action under the circumstance of that case.  *Id.* Nestlé's course of conduct toward Spore after his discrimination charge would deter reporting, and therefore are sufficiently adverse actions to support a claim.

Spore had already been told by Gilbert to start looking for another job.  Nestlé's emails demonstrate its managers included Spore in the "opt out" process, even though he was not part of the metro region where the "opt out" was being offered.  Nestlé cannot dispute that it was the metro "super route" assignment to Spore that made him part of the

"metro" for purposes of the "opt out" process.  Nestlé's emails demonstrated that its HR managers repeatedly offered Spore the "opt out," revisiting the issue several times.  Spore believed they continued to offer him the "opt out" because accepting it would have required him to sign a release waiving his right to pursue his discrimination claim.

Nestlé does not dispute that giving Spore the "super route" vastly expanded his territory and supervisory responsibilities.  It does not dispute that the new territory given to him was in poor shape, and would more than double his workload, as Gilbert described the territory to Spore in an email.  Spore was aware that Gilbert had threatened to "keep throwing work" at Lisa Sampson until she quit or he succeeded in writing her up.  Nestlé's only argument is that dividing work among remaining employees after one employee leaves is not retaliatory.  That argument fails, because Nestlé cannot show it divided the work in an even-handed, or even logical, manner.  Gilbert skipped over other territories that would have been closer to Spore's existing territory in order to give him an underperforming "super route" in the metro area.

Nestlé does not dispute that, since Spore filed his discrimination charges, he has had a larger territory and more direct reports than other DSLs.  Being overloaded with work, assigned a larger territory and more direct reports and repeatedly being asked to resign ("opt out") and release discrimination claims are actions that would deter a reasonable person from making a charge of discrimination.

Nestlé may argue at trial that it had non-retaliatory reasons for its actions, but its motion is solely brought on the basis that it took no adverse employment action.  Nestlé

has failed to carry its burden to show that no jury could find that its conduct would dissuade a reasonable person from reporting discrimination.

## CONCLUSION

Nestlé does not dispute that there is direct evidence of discrimination, supported by many witnesses who heard the many age-based comments by managers directly advocating terminating older, long-tenured employees.  In bringing its narrowly-tailored motion for summary judgment, Nestlé raises only the question of whether Spore or Stark were subjected to "adverse" actions.  Being "performance managed out," with "exit plans" in place, in complete disregard for the objective evidence of good performance is "adverse action."  Scott Agan was "alarmed" at the age and tenure of these two older, seasoned DSL veterans, and pushed them down the same "PIP" path that had secured the resignations of other seasoned veterans.  Nestlé has not presented evidence eliminating the possibility of age discrimination in this case, and its motion must fail.

Dated:  August 1, 2014                    s/Leslie L. Lienemann
                                          Leslie L. Lienemann
                                          Celeste E. Culberth
                                          **CULBERTH & LIENEMANN, LLP**
                                          1050 UBS Plaza
                                          444 Cedar Street
                                          St. Paul, MN 55101

                                          **ATTORNEYS FOR PLAINTIFFS**