# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **Leif Spore and Brian Stark,** | Civil No. 13-CV-649 (SRN/HB) |
| **Plaintiffs,** | **MEMORANDUM OPINION AND ORDER** |
| **v.** | |
| **Dreyer's Grand Ice Cream, Inc., d/b/a Nestlé DSD Company,** | |
| **Defendant**. | |

---

Celeste E. Culberth and Leslie L. Lienemann, Culberth & Lienemann, LLP, 444 Cedar Street, Suite 1050, St. Paul, Minnesota 55101, for Plaintiffs

Jacqueline A. Mrachek and Sean R. Somermeyer, Faegre Baker Daniels, LLP, 90 South 7th Street, Suite 2200, Minneapolis, Minnesota 55402, for Defendant

---

SUSAN RICHARD NELSON, United States District Court Judge

This matter is before the Court on Defendant's Motion for Summary Judgment [Doc. No. 36]. Plaintiffs Leif Spore and Brian Stark asserted claims against Defendant Dreyer's Grand Ice Cream, Inc., d/b/a Nestlé DSD Company ("Nestlé") alleging violations of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01, et seq., based on age discrimination (Count I) and reprisal (Count II).[1] Several weeks after

---

[1] Plaintiffs filed their lawsuit in state court. (Compl. [Doc. No. 1-1].) Nestlé, a Delaware corporation, with its principal place of business in California, removed to this Court, asserting diversity jurisdiction. (Notice of Removal ¶¶ 4-6 [Doc. No. 1].)

the hearing on the instant motion, Spore resolved his dispute with Nestlé.  (Minute Entry

of 1/9/15 [Doc. No. 59].)   Because the reprisal claim in Count II related only to Spore

and is now resolved, this Order addresses only Stark's claim of age discrimination against

Nestlé.[2]  For the reasons set forth herein, Defendant's Motion is denied.

## I.    BACKGROUND

### A.    Employment and Corporate History

Stark began working for Tombstone Pizza in the 1980s and, after Kraft Foods'

("Kraft's") 1989 acquisition of Tombstone Pizza, worked for Kraft's Frozen Pizza

Division as a District Manager.  (Stark Dep. 25, 27, 40-41, Ex. A to Sommermeyer Aff.

[Doc. No. 39].)  As of January 1, 2012, Stark was 56 years old.  (Catlett-King Decl. ¶ 7

[Doc. No. 40].)  As a District Manager, Stark managed sales representatives and oversaw

a sales territory in Minnesota.  (Stark Dep. 25, 27, 40-41, Ex. A to Sommermeyer Aff.

[Doc. No. 39]; Stark Decl. ¶ 2 [Doc. No. 46].)  In 2010, Nestlé acquired Kraft's Frozen

Pizza Division.  (Catlett-King Decl. ¶ 4 [Doc. No. 40].)  Nestlé provides store delivery of

pizza, ice cream, and other frozen foods on behalf of Nestlé Dreyer's Ice Cream

Company.  (Id. at ¶ 3.)  Nestlé's employees perform sales activities at customers' retail

locations, oversee delivery, monitor inventory, and manage the placement and rotation of

Defendant's products.  (Id.)  At the time of Nestlé's acquisition of Kraft's Frozen Pizza

Division, Stark became a Nestlé employee and his position title changed to District Sales

---

[2]  Facts concerning Spore are noted, however, when relevant, to provide factual
context to Stark's discrimination claim.

Leader ("DSL").  (Spore Dep. 48-49, 59-60, Ex. B to Somermeyer Aff. [Doc. No. 39].)

Also at that time, seven of Nestlé's eight DSLs came from Kraft.  (Id. at 76-77.)

Initially, the DSLs' roles did not greatly change following the acquisition – they were

primarily responsible for supervising sales representatives who made direct sales to

customers from their trucks, stocking shelves, and placing products in stores.  (Catlett-

King Decl. ¶ 5 [Doc. No. 40].)

    In 2011, Nestlé began a complicated and difficult process of integrating its ice

cream and frozen pizza direct store delivery operations.  (Spore Dep. 93, Ex. B to

Somermeyer Aff. [Doc. No. 39].)  Through the frozen foods integration process, frozen

pizza and ice cream would be sold from the same trucks as part of the same distribution

chain.  (Id.)  Nestlé undertook the integration of its pizza and ice cream operations in

order to streamline the supply chain so that both products would be delivered at the same

time, to the same store, on the same delivery route.  (Catlett-King Decl. ¶ 4 [Doc. No.

40].)  Nestlé's General Manager of the North Central Region, Scott Agan, testified that

the process of integration involved the implementation of new strategies, processes, and

tools across Nestlé's direct store delivery business.  (Agan Dep. 164-65, Ex. C to

Somermeyer Aff. [Doc. No. 39].)

    Agan testified that the integration process caused the DSLs' role to undergo a

"monumental, dynamic change."  (Id. at 164-65; Spore Dep. 95, Ex. B to Somermeyer

Aff. [Doc. No. 39].)  DSLs were expected to perform a strategic role in leading and

coaching sales representatives on matters such as selling opportunities, monitoring

3

competitors, presenting products effectively, and strategically selling products.  (Jaynes

Dep. 34, Ex. E to Somermeyer Aff. [Doc. No. 39]; Agan Dep. 62-62, Ex. C to

Somermeyer Aff. [Doc. No. 39].)  In addition, the DSLs were to oversee delivery agents,

merchandisers, sales representatives, and other front-line personnel within their assigned

territories and were responsible for training front-line employees to ensure the consistent

implementation of Nestlé's sales strategies and promotional activities.  (Agan Dep. 62-63,

Ex. C to Somermeyer Aff. [Doc. No. 39].)   Specifically, all DSLs were responsible for

hiring and scheduling the front-line personnel, monitoring time cards, safety compliance,

and other supervisory tasks.  (Stark Dep. 79-89, Ex. A to Somermeyer Aff. [Doc. No. 39];

Spore Dep. 62-69, 73, Ex. B to Somermeyer Aff. [Doc. No. 39].)  Nestlé's Human

Resources ("HR") Director Laurel Catlett-King testified that these duties required strong

communication with front-line employees and Nestlé leadership, along with an

understanding of, and ability to prioritize, Nestlé's business needs.  (Catlett-King Dep.

36, Ex. F to Somermeyer Aff. [Doc. No. 39].)

     Stark's view of the change, however, was more prosaic.  He attests that his

essential job remained the same, but "[w]hat changed in my job were the managers . . .

and the new 'processes'" that he was told he "could not learn because of my age. . . ."

(Stark Decl. ¶ 2 [Doc. No. 46].)   The post-integration roles of DSLs required more

meetings, paperwork, conference calls, and email communications than Nestlé had

previously required of its DSLs.  (Stark Dep. 79-89, Ex. A to Somermeyer Aff. [Doc. No.

39]; Spore Dep. 62-68, 73, Ex. B to Somermeyer Aff. [Doc. No. 39].)  Among the new

requirements, Nestlé's DSLs were to implement a process called "Drivers for Growth," or "D4G," which required a number of regularly-scheduled meetings, or "work withs," between DSLs and their sales representatives. (Agan Dep. 64-65, Ex. C to Sommermeyer Aff. [Doc. No. 39].)  Nestlé required the DSLs to document their "work withs" in "flow books."  (Id. at 64-65, 71-72.)

An Area Sales Leader ("ASL") supervised the DSLs.  (Stark Dep. 95, Ex. A to Sommermeyer Aff. [Doc. No. 39].)   When Nestlé acquired Kraft, Tom Kennedy, who had supervised Stark when he was employed by Kraft, continued to supervise all DSLs in Minnesota.  (Id.)  After Kennedy left the company in May 2011, Jeff Rauch served as the Interim ASL for Minnesota during most of the integration process.  (Rauch Dep. 9, 14, 16, Ex. I to Sommermeyer Aff. [Doc. No. 39].)  Above the ASLs, Regional General Managers supervised all ASLs, DSLs, and front-line personnel in a given area.  (See Agan Dep. 25-27, Ex. C to Sommermeyer Aff. [Doc. No. 39].)  In March 2011, Agan began working as General Manager of the North Central Region, which included Minnesota. (Id.)

A former Nestlé ASL for Wisconsin, Kevin Moore, described the entire integration process as stressful, particularly for DSLs.  (Moore Dep. 46, Ex. D to Sommermeyer Aff. [Doc. No. 39].)  Nestlé's HR Director Catlett-King testified that because of the changes to the DSL position caused by Nestlé's integration process, DSLs generally complained about the workload, new responsibilities, expectations for time spent with front-line employees, and the ability to accomplish these tasks in their regular work time.  (Catlett-

5

King Dep. 145, Ex. F to Somermeyer Aff. [Doc. No. 39].)   Moore explained that while

Kraft had been a demanding organization and that DSLs were used to working in a "high-

expectations environment," Nestlé's new requirements for reporting and documenting

activities were different.  (Moore Dep. 47, Ex. D to Somermeyer Aff. [Doc. No. 39].)

Specifically, Moore testified that DSLs were concerned about maintaining high-quality

customer service in light of some of the changes caused by integration.  (Moore Dep. 49-

51, Ex. D to Somermeyer Aff. [Doc. No. 39].)

### B.    Age-Related Comments

As of January 1, 2012, Stark was 56 years old; the ages of all of the DSLs working

for Nestlé in Minnesota at that time were as follows:

| Jackson, Stacey L. | 43 |
| Grimm, Patrick A. | 46 |
| Schmisek, David R. | 49 |
| Enockson, Blake A. | 50 |
| Compton, John W. | 50 |
| Spore, Leif O. | 51 |
| Dahl, David A. | 56 |
| Stark, Brian | 56 |
| Burg, Roger A. | 62 |

(Catlett-King Decl. ¶ 7 [Doc. No. 40].)

Shortly after Agan became Regional General Manager in March 2011, he held a

meeting attended by DSLs from Minnesota, including Stark, Spore, and Stacey Jackson,

as well as Nestlé's HR staff, including Amanda Sorrento and Jillian Jaynes.  (Spore Dep.

176, 211-12, Ex. 10 to Lienemann Decl. [Doc. No. 47]; Stark Dep. 206, Ex. 11 to

Lienemann Decl. [Doc. No. 47]; Jackson Dep. 12-16, Ex. 5 to Somermeyer Aff. [Doc.

No. 39].)  After exchanging introductions with the DSLs, which included reference to

length of service, Agan commented that he was "alarmed" by the "age and tenure" in the

room.  (Spore Dep. 176, 184, 226, 265, Ex. 10 to Lienemann Decl. [Doc. No. 47], Stark

Dep. 202, Ex. 11 to Lienemann Decl. [Doc. No. 47].)  Although HR representatives

attended the meeting, they said nothing in response to Agan's comments regarding age

and tenure.  (Spore Dep. 177, 265, Ex. 10 to Lienemann Decl. [Doc. No. 47]; Stark Dep.

202-06, Ex. 11 to Lienemann Decl. [Doc. No. 47].)  Agan, who revealed that he had only

remained in any given job for five to seven years, stated that managers should follow his

example and "move up or move out."  (Spore Dep. 184-86, 265, Ex. 10 to Lienemann

Decl. [Doc. No. 47]; Stark Dep. 298, Ex. 11 to Lienemann Decl. [Doc. No. 47].)  Agan's

remarks about age and tenure concerned Spore and Stark, both of whom had been in their

positions for more than twenty years.  (Spore Dep. 15, 17-18, 20, 27-28, 186-87, 211-12,

Ex. 10 to Lienemann Decl. [Doc. No. 47]; Stark Dep. 23-25, 27, 35, 298, Ex. 11 to

Lienemann Decl. [Doc. No. 47].)   In his deposition, Agan denied having made such

comments about age and tenure.  (Agan Dep. 42, Ex. 1 to Lienemann Decl. [Doc. No.

47].)

At the time of Agan's hire, Kennedy, who was in his 50s, was the ASL for

Minnesota, a position that he had held for a number of years.  (Stark Dep. 95, Ex. 11 to

Lienemann Decl. [Doc. No. 47]; Spore Dep. 31, 42-46, 108, Ex. 10 to Lienemann Decl.

[Doc. No. 47].)   Shortly after Agan became Regional General Manager, Kennedy took a

medical leave of absence.  (Agan Dep. 32, Ex. 1 to Lienemann Decl. [Doc. No. 47].)

Agan contacted Kennedy during his leave and offered a severance package, which

Kennedy accepted.  (Agan Dep. 32, Ex. 1 to Lienemann Decl. [Doc. No. 47].)   Some

time later, during a market tour with DSL Spore, Agan divulged that Kennedy had not left

Nestlé of his own accord.   (Spore Dep. 148, Ex. 3 to Lienemann Decl. [Doc. No. 47].)

Rather, Agan told Spore that Kennedy had left Nestlé because he "did not have what it

takes" and that he lacked the skill set to manage his team.  Spore asked, "So [Kennedy]

did not retire?"  (Id. at 149.)  Spore testified that Agan responded, sarcastically, "Well,

you can call it what you want."  (Id.)

     In October 2011, Nestlé hired Kenny Gilbert as the ASL for Minnesota.  (Gilbert

Dep. 18, Ex. 4 to Lienemann Aff. [Doc. No. 47].)   Gilbert regularly expressed interest in

the age and tenure of the DSLs.  (See Stark Dep. 165-67, 299-300, Ex. 11 to Lienemann

Decl. [Doc. No. 47].)  He asked both Stark and Spore their respective ages and length of

tenure with the company.  (See Attachments to MDHR Charges, Exs. 28 & 29 to

Lienemann Aff. [Doc. No. 47].)  Stark testified that Gilbert badgered and verbally

harassed him on a daily basis, frequently bringing up the issue of age, either directly or

indirectly.  (Stark Dep. 165-67, 299-300, Ex. 11 to Lienemann Decl. [Doc. No. 47].)

Gilbert repeatedly told Stark that Stark lacked the right skill set to perform his job and

was not capable of change.  (Id.)  In addition, Gilbert told Stark that while older,

8

experienced managers could be trained, they would not be able to "maintain" because of ingrained bad habits.  (Id. at 299-300.)

Former DSL Stacey Jackson testified that both Agan and Gilbert told the DSLs that Nestlé preferred to hire young people straight out of college.  (Jackson Dep. 16, Ex. 5 to Lienemann Decl. [Doc. No. 47].)  Consistent with Jackson's testimony, former ASL for Wisconsin Moore believed that Nestlé's corporate culture emphasized hiring new college graduates for entry-level management positions. (Moore Dep. 11, Ex. 7 to Lienemann Decl. [Doc. No. 47].)  Moore testified that Agan was generally dissatisfied with the longevity of former Kraft Frozen Pizza Division employees.  (Id. at 9-10.)

Lisa Sampson, an administrative employee in Minnesota who worked at the front desk as the Area Business Coordinator, testified that she occasionally heard Gilbert negatively comment about older employees getting injured, taking too long to perform tasks, and being stuck in their ways.  (Sampson Dep. 7, 9, Ex. 9 to Lienemann Decl. [Doc. No. 47].)  Because of the proximity of her work space to Gilbert's office, Sampson could overhear some of his conversations.  (See id. at 16.)  Following a roundtable meeting held by Gilbert with sales representatives who reported to Stark, Sampson overheard Gilbert state, "I kept asking them questions, but they wouldn't throw him under the bus."  (Id. at 17-18.)  Sampson also overheard Gilbert and Stark speaking to each other in loud voices, with Stark complaining that his district was receiving a disproportionate and unrealistic amount of work.  (Id. at 16-17, 29.)   Sampson further testified that Gilbert used a demeaning tone of voice when speaking to Stark.  (Id.)

In addition to the age-related comments of Agan and Gilbert, Nestlé's Safety, Health and Environmental Manager Ed Wozniak commented at meetings with DSLs about "performance managing out" habitually injured workers, because they cost the company too much money. (Spore Dep. 210, 215-16, Ex. 10 to Lienemann Decl. [Doc. No. 47].)  Wozniak also stated that Nestlé had inherited an aging workforce from Kraft (id.), and that older workers were more likely to be injured.  (Jackson Dep. 14, Ex. 5 to Lienemann Decl. [Doc. No. 47].)  Nestlé's HR staff also commented about the "aging workforce."  (Spore Dep. 217-19, Ex. B to Somermeyer Aff. [Doc. No. 39].)

Stark testified that ASL Agan demeaned him in other ways, by calling him "teacher's pet" and accusing him of "sucking up to the boss" in group meetings when he merely turned in requested paperwork.  (Stark Dep. 295-97, Ex. A to Somermeyer Aff. [Doc. No. 39].)

### C.    Oversight and Evaluation

#### 1.    Processes

Nestlé provides informal and formal oversight of its DSLs.  As a more informal measure, Nestlé holds weekly conference calls to discuss DSLs' compliance with D4G. (Gilbert Dep. 60-61 & Gilbert Ex. 1, Ex. G to Somermeyer Aff. [Doc. No. 39].)  In addition, DSLs' managers periodically conduct "market tours," in which one or more managers accompany a DSL on a tour of the DSL's sales territory.  (Agan Dep. 93-94, Ex. C to Somermeyer Aff. [Doc. No. 39].)  Market tours are aimed at assessing a DSL's execution of Nestlé's promotional and marketing programs, business knowledge,

consistency of promotional displays, and success at increasing sales and gaining space on customers' shelves.  (Id.; Gilbert Dep. 35-36, Ex. G to Somermeyer Aff. [Doc. No. 39].)  In addition to market tours, Nestlé's management hold roundtable meetings, or "roundtables," with the DSLs' front-line employees as a means of soliciting feedback on the DSLs' performance.  (Agan Dep. 131, Ex. C to Somermeyer Aff. [Doc. No. 39]; Gilbert Dep. 45-46, Ex. G to Somermeyer Aff. [Doc. No. 39].)

Nestlé also provides formal mid-year and year-end performance reviews to DSLs.  (Catlett-King Decl. ¶ 6 [Doc. No. 40].)  In the reviews, Nestlé evaluates the quantifiable aspects of performance, as measured by sales numbers, as well as more subjective factors relating to how the sales results were obtained.  (Id.)  Among the factors that Nestlé uses to evaluate DSLs, it considers financial metrics, leadership, attitude, communication, and a willingness and interest in responding to feedback.  (Agan Dep. 69-71, Ex. C to Somermeyer Aff. [Doc. No. 39]; Catlett-King Dep. 110, Ex. F to Somermeyer Aff. [Doc. No. 39].)  At all times relevant to this action, Nestlé rated DSLs' performance on a scale of 1 to 5, with 1 indicating the highest rating and 5 the lowest.  (Catlett-King Decl. ¶ 6 [Doc. No. 40].)  The rating scales were also tied to year-end bonuses, so that employees receiving scores of 3 or higher received full bonuses, employees receiving scores of 4 received half of a bonus, and employees receiving scores of 5 received no year-end bonus.  (Id.)

In the review process, Nestlé's ASLs first recommend a proposed rating for the DSLs whom they oversee.  (Jaynes Dep. 74, Ex. E to Somermeyer Aff. [Doc. No. 39].)

11

ASLs then meet with HR at "calibration meetings" to discuss the proposed ratings in order to ensure consistency on a regional level and to make final recommendations.  (Id.) Performance ratings are then discussed at a national level, employing a similar calibration process.  (Id.)  After the performance ratings are approved, DSLs meet with their respective ASL to receive their review and rating.  (Id. at 91-92.)

In addition to the calibration of end-of-year assessments, Nestlé also performs "calibrations on talent assessments."  (Id. at 72, 77.)  Through these talent assessments, Nestlé considers employees' performance potential and also plans for succession.  (Id. at 77.)  With HR's involvement, ASLs identify positions that are expected to open in the future as well as the persons who might be available to fill the positions, and the timing of any such changes.  (Id. at 77-78.)

### 2.    2011 Mid-Year Review and First Market Tour

Stark completed a self-evaluation portion of his mid-year 2011 performance review in August 2011.  (Stark Dep. 92-94, Ex. A to Somermeyer Aff. [Doc. No. 39].) As the Interim ASL at the time, Rauch drafted the mid-year 2011 performance reviews. (Rauch Dep. 18, Ex. I to Somermeyer Aff. [Doc. No. 39].)  Rauch acknowledged that the market integration process was a heavy focus of Stark's activities for the first half of 2011.  (2011 Mid-Year Review at S08141, Rauch Ex. 5, Ex. I to Somermeyer Aff. [Doc. No. 39].)  Nevertheless, Rauch criticized Stark's sales results and use of flow books.  (Id.) In addition, Rauch stated, "To date, safety and people leadership has been below expectations for a DSL.  We look for Brian to improve immediately in these two areas

and maintain the level of leadership outlined by this document." (Id.)  Rausch testified

that several criticisms found in the reviews of Stark and Spore applied to all DSLs.

(Rausch Dep. 64-69, Ex. 8 to Lienemann Decl. [Doc. No. 47].)

Newly-hired ASL Gilbert presented Stark with the mid-year review in mid-

November 2011, with only six weeks remaining in the fiscal year.  (Stark Decl. ¶ 8 [Doc.

No. 46].)  Stark was angry about the review, believing that certain deficiencies –

particularly those concerning safety – were unfounded and unfair.  (Stark Decl. ¶ 8 [Doc.

No. 46].)  Immediately after receiving the review, Stark telephoned Wozniak, Nestlé's

Safety, Health and Environmental Manager, asking for specifics about how Stark "was

behind on safety leadership." (Id.)  Wozniak informed Stark that he was not lagging in

that area. (Id.)  Stark also believed that his sales numbers and D4G data were as good or

better than other DSLs in the area.  (Id.)  A November 2011 chart measuring performance

with the "D4G" program showed that Stark received a percentage of 100% or greater in

every category.  (D4G Chart, 11/11, Ex. 23 to Lienemann Decl. [Doc. No. 47].)

On December 7, 2011, Gilbert and Agan conducted a tour of Stark's sales market.

(Stark Dep. 33, 38, Ex. A to Somermeyer Aff. [Doc. No. 39].)  Stark had received less

than one day's notice of the tour.  (Stark Decl. ¶ 9 [Doc. No. 46].)  When Gilbert

informed Stark of the tour, Stark asked if he could switch the date with fellow DSL John

Compton, whose market tour was scheduled the following day.  (Id.)  Stark made the

request due to a family medical event. (Id.)[3]  Gilbert refused and questioned Stark's need

to be present with his family.  (Id.)  On the tour, Gilbert and Agan noted that Stark

possessed a positive attitude, but identified deficiencies in the areas of communication,

coaching of sales staff, documentation, and supply of stock.  (Stark Ex. 10 at S08314-15.)

Stark testified that he was set up to fail the market tour, having been given only 16 hours

notice during a busy week in the holiday season, when stock is in high demand.  (Stark

Dep.  218, Ex. A to Somermeyer Aff. [Doc. No. 39].)

Stark contacted HR Manager Jillian Jaynes on January 3, 2012, to report his belief

that he had received less notice for his market tour than fellow DSLs Compton (age 50)

and Tony Grimm (age 46), and that he had been scheduled for more market tours than

other DSLs.  (Stark Dep. 171-72,  Ex. A to Somermeyer Decl. [Doc. No. 39]; Jaynes Dep.

66 & Jaynes Ex. 8, Ex. E to Somermeyer Decl. [Doc. No. 39].)   Stark testified that he

told HR that believed he was being "performance manage[d] out" and that Gilbert and

Agan were treating him differently than younger managers with respect to the market

tours.  (Stark Dep. 171-72, 307-11, 319-20, Ex. A to Somermeyer Aff. [Doc. No. 39].)

Finding that some of Stark's concerns were "valid" (Ex. 8 to Jaynes Dep., Ex. E to

Somermeyer Aff. [Doc. No. 39]), Jaynes followed up with Gilbert about providing

consistent notice to DSLs prior to market tours.  (Jaynes Dep. 69, Ex. E to Somermeyer

---

[3]  Stark explained to Gilbert that his daughter was scheduled to deliver a child with spina bifida on December 7, and he wanted to be at the hospital, as there was a high risk of complications.  (Id.)

Aff. [Doc. No. 39].)  Jaynes testified that because the frequency of market tours was influenced by past identified deficiencies, it was not possible to establish uniform frequency among the DSLs.  (Id. at 70.)

### 3.   Contingency and Succession Plans

In an October 16, 2011 email, Catlett-King reported the results of a contingency-planning meeting held with Rausch and Eric Yergens in which three Minnesota DSLs were identified as potential exiting employees in 2012:  Stark, Spore, and Dave Dahl, a 56-year-old DSL.  (10/16/11 Email, Ex. 13 to Lienemann Decl. [Doc. No. 47].)  Stark attests that he had told no one at Nestlé of any plans to quit.  (Stark Decl. ¶ 7 [Doc. No. 46].)  Catlett-King testified that Agan had identified the three DSLs likely to leave. (Catlett-King Dep. 42, Ex. 3 to Lienemann Decl. [Doc. No. 47].)  Of the three replacement DSLs that Nestlé identified – Katie Mislin, Selena Rivera, and Megan Laughlin – at least two were known to be recent college graduates.  (Id. at 41-42, 74; Rausch Dep. 39-41, Ex. 8 to Lienemann Decl. [Doc. No. 47].)  Defendant maintains that throughout this contingency planning, there were no plans to terminate "these underperforming DSLs."  (Def.'s Mem. Supp. Mot. for Summ. J. at 14 [Doc. No. 38]) (citing Rauch Dep. 50, Ex. I to Somermeyer Aff. [Doc. No.39]; Agan Dep. 90, 129-30, Ex. C to Somermeyer Aff. [Doc. No. 39]; Jaynes Dep. 47-49, Ex. E to Somermeyer Aff. [Doc. No. 39].)

However, a December 15, 2011 email from Catlett-King to Gilbert addressed the the termination of Spore as well as the application of Spore's daughter to work at Nestlé

15

as a part-time merchandiser.  (12/15/11 Email, Ex. 16 to Lienemann Decl. [Doc. No. 47].)

Catlett-King recommended against extending an offer to Spore's daughter, noting that

Nestlé would be "moving on her father within a couple of months."  (12/15/11 Email, Ex.

16 to Lienemann Decl. [Doc. No. 47].)  She further stated, ". . . we should plan to place

[Spore] on a PIP in conjunction with his end of year review – my guess is that you will

have a fair amount of ammo for this document after your [market tour] with [Agan] in

early January."  (Id.)  When asked at her deposition about the meaning of "ammo,"

Catlett-King denied that it mean "ammunition," and denied that "moving on her father"

meant termination of employment.  (Catlett-King Dep. 124-25, Ex. 3 to Lienemann Decl.

[Doc. No. 47].)

Approximately one month later, in January 2012, Catlett-King drafted a chart

called "MN DSL Timing_Plan," which indicated that Nestlé's "Proposed Next Step" for

Spore was "Exit."  (Email of 1/10/12 at NES00006663, Ex. 17 to Lienemann Decl. [Doc.

No. 47].)  In addition, the document showed that Spore was to receive a PIP in connection

with his year-end review, and was to be replaced or "backfilled" as of April 1.  (Id.)  The

chart listed Stark as Spore's temporary replacement.  (Id.)  In the entry for Stark, while

the temporary backfill position was noted, the chart also identified Stark's "planned

backfill" as Tom Chodl, age 23.  (Id. at NES00006661; NES00006663.)   In Catlett-

King's transmittal email, she wrote, "We rated Stark a 5 in the [end-of-year] review, but

we don't seem to have an immediate exit plan for him.  Should we actually change this

rating to a 4?"  (Id. at NES00006661.)  In her deposition, Catlett-King testified that "exit"

does not necessarily mean termination of employment, although she conceded that "exit" generally means "to leave." (Catlett-King Dep. 64-65, Ex. 3 to Lienemann Decl. [Doc. No. 47].) She could provide no explanation as to who provided the April 1 date for Spore's exit, nor why a date certain was provided only for Spore, when entries next to other employees indicated "NA" or "TBD." (Id.) Agan acknowledged in his deposition that none of the three DSLs identified as potentially departing the company had expressed any intention of leaving. (Agan Dep. 81-84, Ex. 1 to Lienemann Decl. [Doc. No. 47].)

### 4.   Second Market Tour and 2011 Year-End Reviews and Ratings

In late January or early February 2012, Agan conducted a second market tour of Stark's area, attended by Stark, Gilbert, and Luis Andrade, who was the Vice President for Field Operations for Nestlé Direct Store Delivery and Agan's supervisor. (Stark Dep. 161-62, Ex. A to Sommermeyer Aff. [Doc. No. 39]; Catlett-King Decl. ¶ 11 [Doc. No. 40].) Stark contends that he received even less notice of his second market tour (Stark Decl. ¶ 5 [Doc. No. 46]), which was scheduled during another high-sales volume period – Super Bowl week. (Id. ¶ 10.) Andrade commented positively on Stark's stores and was particularly impressed with one of the pizza displays, exclaiming and photographing it. (Id.) Stark's territory covered more than 100 stores, but the tour involved only two stores, and Agan departed after visiting only one store. (Id.) Despite the positive feedback during the tour, Gilbert later repeated many of the same criticisms identified during Stark's first market tour, and announced via email to Catlett-King his intention to place Stark directly on a PIP. (Gilbert Dep. 108, Ex. G to Sommermeyer Aff. [Doc. No. 39];

17

Catlett-King Dep. 113 & Catlett-King Exs. 8-9, Ex. F to Somermeyer Aff. [Doc. No. 39];

Email of 2/6/12, Ex. 18 to Lienemann Decl. [Doc. No. 47].)

Gilbert delivered Stark's year-end 2011 review on February 17, 2012, giving Stark

the lowest possible performance rating of 5.  (Stark Dep. 145-47 & Stark Ex. 3, Ex. A to

Somermeyer Aff. [Doc. No. 39].)  This rating meant that Stark would not be entitled to a

2011 year-end bonus.  (Catlett-King Decl. ¶ 6 [Doc. No. 40].)  Stark's 2011 year-end

bonus was projected to have been $10,311.26.  (2011 Incentive Calculation Summary,

Ex. 19 to Lienemann Decl. [Doc. No. 47].)  In addition, Gilbert informed Stark about the

PIP.  (Gilbert Dep. 115, Ex. G to Somermeyer Aff. [Doc. No. 39].)  Stark believes that

Gilbert showed him a document to this effect as well.  (Stark Dep. 173-74, Ex. A to

Somermeyer Aff. [Doc. No. 39]; Stark Decl. ¶ 6 [Doc. No. 46].)  Because Stark had

applied internally for another position at Nestlé, he asked Gilbert how a PIP would impact

his application.  (Stark Decl. ¶ 7 [Doc. No. 46].)  Gilbert informed Stark that he was

required to tell the other Nestlé hiring manager about Stark's performance rating of 5.

(Id.)

In Gilbert's email to Catlett-King following the second market tour, Gilbert

confirmed that Stark was aware that he was going on a PIP.  (Email of 2/6/12, Ex. 18 to

Lienemann Decl. [Doc. No. 47].)  After conferring with HR, however, Gilbert decided

not to place Stark on a PIP after all, finding that his performance deficiencies did not

warrant that level of recourse.  (Gilbert Dep. 115-16, Ex. G to Somermeyer Aff. [Doc.

No. 39].)  Instead, Gilbert testified that he gave Stark a list of development actions and

resources and followed up later with additional suggestions.  (Id. at 115-16, 124-25.)

Stark, however, could not recall that Gilbert discussed any such suggestions in connection

with the second market tour.  (Stark Dep. 288, Ex. 11 to Lienemann Aff. [Doc. No. 47].)

Rather, Stark recalled that Gilbert reviewed a written recap of the market tour and told

him that he was going on a PIP.  (Id.)  Despite Gilbert's negative assessment of Stark's

performance, at approximately the same time, DSL dashboard performance standards

prepared by Agan in the last week of February 2012 (id. ¶ 16) showed that the two

highest performing DSLs in the category of "Month-to-Date versus Target" performance

were Spore (with a score of 97%) and Stark (with a score of 94%).  (Nestlé Target

Tracker Chart, 2/12, Ex. 22 to Lienemann Decl. [Doc. No. 47].)

     A few days later, on February 22, 2012, Stark contacted HR, contesting the 5

rating on his year-end review and advocating for a change to a rating of 4.  (Stark Dep.

Ex. 3, Ex. A to Somermeyer Aff. [Doc. No. 39].)  He further indicated that he had the

right plans in place to succeed and would put in the necessary extra effort.  (Id.)

     Spore likewise received a 2011 performance review rating of 5 and was told that

he was being placed on a PIP.  (Spore Dep. 241-42, Ex. B to Somermeyer Aff. [Doc. No.

39]; Catlett-King Dep. 53-55, Ex. F to Somermeyer Aff. [Doc. No. 39].)  Spore, along

with Stark, was among three DSLs in Minnesota who received ratings of 5 in their 2011

year-end reviews.  (Catlett-King Decl. at ¶¶ 6, 8 [Doc. No. 40].)  When Gilbert advised

Spore of his rating and the PIP, he also told Spore that he lacked "the skill set" to be a

DSL, and because he had a very slim chance of surviving a PIP, he should seek other

19

employment opportunities.  (Spore Dep. 241-42, Ex. B to Somermeyer Aff. [Doc. No. 39]; Spore Decl. ¶ 9 [Doc. No. 45].)  Spore testified that these comments caused him to take medical leave, which required hospitalization.  (Spore Dep. 244-45, Ex. B to Somermeyer Aff. [Doc. No. 39].)   When Spore contacted Nestlé's benefits coordinator to report his need for medical leave, the benefits coordinator recorded the following notes:

> EE was told that he [did] not have the skill sets to be a DLS [sic], He was told that he was known in the community so you should consider your options and this was repeated several time[s] and then he was asked about his age and how many years with the company.  EE stated that he was encouraged to look for another job.  EE was hospitalized on 2/1/2012 but he didn't stay for more than 24 hours.  EE was experiencing anxiety and worthlessness.  EE felt like a piece of dirt.

(Email of 2/23/12 at NES00000197, Ex. 21 to Lienemann Decl. [Doc. No. 47].)

### 5.   Nestlé Adjusts Performance Ratings

Catlett-King testified that in response to the concerns of Stark and others, Nestlé reassessed its 2011 year-end performance ratings.  (Catlett-King Dep. 168-70, Ex. F to Somermeyer Aff. [Doc. No. 39].)  Because the DSLs in Minnesota lacked a permanent ASL during the difficult integration period, Nestlé determined that DSLs given a 4 or 5 rating had not received sufficient time to improve in response to performance feedback.  (Id. at 168-70.)  Nestlé therefore adjusted the ratings of its lowest-rated Minnesota employees from a 4 or 5 to a 3.  (Id.)  This change entitled those employees to the receipt of a full 2011 year-end bonus.  (Id.)  The adjustment affected four DSLs in Minnesota – Stark, Spore, Dahl, and Jackson.  (Catlett-King Decl. ¶¶ 8-9 [Doc. No. 40].)

Before Nestlé communicated the rating change to Stark, however, Stark resigned

20

from his employment with Nestlé on March 9, 2012, after receiving an abusive email

from Gilbert.  (Stark Dep. 131-32, Ex. A to Somermeyer Aff. [Doc. No. 39].)  Stark

contends that in response to the email, he had a breakdown at home.  (Stark Decl. ¶ 12

[Doc. No. 46].)  Appearing distraught and experiencing a racing heart rate, Stark was

taken to urgent care, where a severe anxiety attack was diagnosed.  (Id.)  His wife

advised that he quit his job.  (Id.)  Stark feared that he would "end up the same way" as

some of his coworkers who had taken medical leave due to stress.  (Id.)  Stark also attests

that at no time did anyone from Nestlé tell him that he was "taken off the PIP."  (Stark

Decl. ¶ 6 [Doc. No. 46].)  In Stark's resignation letter, he claimed to have been subjected

to a pattern of discrimination based on age, perceived physical disabilities, sex, and race.

(Ex. 13 to Stark Dep., Ex. A to Somermeyer Aff. [Doc. No. 39].)

Nestlé sent Stark a letter dated March 16, 2012, requesting his cooperation in its

investigation of his allegations, and also informing him that his rating would be changed

to a 3 and that he would receive his full 2011 bonus.  (Stark Dep. 257 & Stark Ex. 16, Ex.

A to Somermeyer Aff. [Doc. No. 39].)  Catlett-King testified that she and Jaynes, also in

HR, spoke with Gilbert and Agan about Stark's allegations.  (Catlett-King Dep. 157-58 &

Catlett-King Ex. 15, Ex. F to Somermeyer Aff. [Doc. No. 39].)  Other than providing HR

with a few documents, neither of them could shed any light on why Stark believed that

Nestlé had discriminated against him.  (Id. at 159-61.)   In the investigation of Stark's

allegations, HR did not speak with any DSLs.  (Id. at 160-61.)  Catlett-King also testified

that she and Jaynes attempted to speak with Stark about his claim of discrimination, but

21

he refused.  (Id.)  Stark, however, testified that he responded to HR's investigation, asking to bring with him a witness of his own choosing to any meeting with Nestlé. (Stark Dep. 257-60 & Stark Ex. 16, Ex. A to Somermeyer Aff. [Doc. No. 39].  Instead, Nestlé offered either HR's Jaynes and/or Catlett-King as witnesses, which Stark declined. (Id. at 260.)  No meeting or discussion occurred and HR prepared no written findings of its investigation.  (Catlett-King Dep. 161, Ex. F to Somermeyer Aff. [Doc. No. 39].)

### D.      Minnesota Department of Human Rights Charges

On April 11, 2012, Stark and Spore filed Minnesota Department of Human Rights ("MDHR") charges of discrimination, contending that Nestlé discriminated against them based on race, sex, age, and disability.  (Ex. 14 to Stark Dep., Ex. A to Somermeyer Aff. [Doc. No. 39]; Ex. 1 to Spore Dep., Ex. B to Somermeyer Aff. [Doc. No. 39].)  Both Stark and Spore also noted that they had been deprived of an earned bonus.  (Id.)  Shortly after they filed the charges, Nestlé paid Stark his full bonus on April 19, 2012, and paid Spore his full bonus on April 27, 2012.  (Catlett-King Decl. ¶ 10 [Doc. No. 40].)

After Stark's departure from Nestlé, Nestlé hired two young "DSL Designates" to replace him – Chodl and Mislin.  (Spore Decl. ¶ 17 [Doc. No. 45].)  Mislin left after a few months, but Chodl continued to work as a DSL until receiving a promotion in 2014.  (Id.)

### E.      Experiences of Other Nestlé Employees

Sampson, the Area Business Coordinator, was 52 when she began working for Nestlé.  (Sampson Dep. 9-10, Ex. 9 to Lienemann Decl. [Doc. No. 47].)  She believed that Gilbert found her to be too old for her job.  (Id.)  Gilbert would compare Sampson to a

22

younger employee, recently out of college, saying, "Well, [she] can do it, you should be able to." (Id. at 32.)   Only one week after Gilbert became her manager in October 2011, Sampson testified that he told her that she was not suited for her position, stating, "I see the train going down the tracks one of two ways:  Either I can keep you on for a while and you can look for a job, or I can – I'm gonna throw everything at you and what you can't do I'm gonna write you up for."  (Id. at 10.)  Sampson responded that she needed her job and told Gilbert to "go ahead and throw everything you can at me and I'll do the best I can."  (Id. at 11.)  Sampson testified that Gilbert did in fact "throw everything at her." (Id. at 11-12.)  He assigned additional work, simply for the sake of adding to Sampson's workload, including the creation of spreadsheets, with which Sampson had been previously unfamiliar, and route books that simply gathered dust on a counter top.  (Id. at 11-12.)  After Sampson reported Gilbert's treatment of her to HR, Gilbert demanded an explanation and threatened disciplinary action.  (Id. at 12-14.)  She eventually quit her job, taking a position elsewhere at a lower salary.  (Id. at 26.)

Moore, the former ASL for Wisconsin, had worked for Kraft for 24 years when the Nestlé merger occurred.  (Moore Dep. 6-7, Ex. 7 to Lienemann Decl. [Doc. No. 47].)  In September 2011, Agan met with Moore on a Wednesday to discuss Moore's performance. (Id. at 16.)  At the time of the meeting, Moore was almost 59 years old.  (See id. at 7.) Moore testified that Agan expressed his displeasure with Moore's performance and told him that he would be placed on a PIP the following Monday.  (Id. at 16-17.) Alternatively, Agan told Moore that he had "other options," and mentioned a severance

package.  (Id. at 17.)  Agan further stated that only a very low percentage of employees

are able to "survive" the PIP process and continue their employment.  (Id. at 18-19.)

Agan's statement comported with Moore's understanding of the effect of a PIP.  (Id.)  In

his deposition, Agan denied ever telling Moore that he was going to place him on a PIP.

(Agan Dep. 36, Ex. 1 to Lienemann Decl. [Doc. No. 47].)  Moore elected to take the

severance package, and was replaced by a person estimated to be approximately 35 years

old.  (Moore Dep. 22, 39-40, Ex. 7 to Lienemann Decl. [Doc. No. 47].)

### F.    Future Work for Stark and Spore

During the time that Stark worked for Nestlé, he also worked part-time jobs as a

school bus driver and liquor store clerk in order to defray his children's college expenses.

(Stark Decl. ¶ 13 [Doc. No. 46].)  After he discontinued working for Nestlé, he increased

his part-time hours while he looked for a full-time job.  (Id.)  Within a few months, Stark

found a full-time position earning approximately $35,000 less per year than what he had

earned at Nestlé.  In addition, he lost the potential of earning approximately $8,000-

10,000 in bonus income, as well as the use of a company car.  (Id.)

As to Spore, in May 2013, Gilbert assigned Spore to a new sales district which

included a "super route" that Gilbert himself admitted was "not in great shape."  (Spore

Decl. ¶ 13 [Doc. No. 45].)  The territory stretched from Grand Forks to Bemidji, through

central Minnesota, to downtown Minneapolis.  (Id.)  Nestlé assigned no other DSL this

much territory, with the same measure of responsibility.  (Id.)  Spore contends that this

reassignment effectively doubled his workload.  (Id. ¶ 14.)  With the implementation of a

24

reduction-in-force, Nestlé offered a severance package to Spore, who was then the most

senior DSL in the Twin Cities metropolitan area.  (Spore Dep. 284-85, Ex. 10 to

Lienemann Decl. [Doc. No. 47].)  Spore refused the severance package, believing that it

required him to give up certain legal rights concerning his employment and because he

needed the income from the job.  (Id.)  Spore complained to Jaynes in HR that this

reassignment appeared to be in retaliation for the filing of discrimination charges in 2012.

(Spore Decl. ¶ 15 [Doc. No. 45].)  As previously noted, Spore has since resolved his legal

dispute with Nestlé.  (Minute Entry of 1/9/15 [Doc. No. 59].)

## II.    DISCUSSION

### A.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court

must view the evidence and the inferences that may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  Enter. Bank v. Magna Bank

of Missouri, 92 F.3d 743, 747 (8th Cir. 1996).  However, "summary judgment procedure

is properly regarded not as a disfavored procedural shortcut, but rather as an integral part

of the Federal Rules as a whole, which are designed to secure the just, speedy, and

inexpensive determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327

(1986).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  Id. at 323; Enter. Bank,

92 F.3d at 747.  A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

Nestlé moves for summary judgment against Stark, arguing that he fails to demonstrate the existence of a materially adverse employment action.  (Def.'s Reply Mem. at 4 [Doc. No. 49].)  Specifically, Nestlé contends that Stark's poor performance review, the threat of a PIP, and negative comments do not constitute adverse actions. (Def.'s Mem. Supp. Mot. for Summ. J. at 24-27, 34-35 [Doc. No. 38].)  Also, Defendant argues that Stark's theory of constructive discharge fails to meet the high standard required to support such a claim.  (<u>Id.</u> at 30-34.)  In response, Plaintiff argues that he has presented evidence of adverse actions, including constructive discharge, the threat of termination, and "file-papering," from which a jury could find that Nestlé discriminated against him.  (Pl.'s Opp'n Mem. at 26-27 [Doc. No. 44].)

### B.    MHRA Age Discrimination

To survive a defendant's summary judgment motion, an age discrimination plaintiff must demonstrate direct evidence of discrimination or provide indirect evidence from which discrimination may be inferred.  <u>Ramlet v. E.F. Johnson Co.</u>, 507 F.3d 1149, 1152 (8th Cir. 2007).  Direct evidence of discrimination "clearly points to the presence of an illegal motive" for the adverse employment action.  <u>See</u> <u>Hilde v. City of Eveleth</u>, __ F.3d __, 2015 WL 467749, at *3 (8th Cir. Feb. 5, 2015) (quoting <u>Torgerson v. City of</u>

Rochester, 643 F.3d 1031, 1044 (8th Cir. 2011)).  Such evidence shows "a specific link

between the alleged discriminatory animus and the challenged decision, sufficient to

support a finding by a reasonable factfinder that an illegitimate criterion actually

motivated the adverse employment action." Tenge v. Phillips Modern Ag Co., 446 F.3d

903, 907 (8th Cir. 2006).  Where a plaintiff has direct evidence of discrimination, the

plaintiff may simply submit such evidence to the factfinder.  Darke v. Lurie Besikof

Lapidus & Co., LLP, 550 F. Supp. 2d 1032, 1040-41 (D. Minn. 2008).  Direct evidence

may include evidence of the employer's actions or remarks that reflect a discriminatory

attitude, comments showing discriminatory animus in the decisional process, or

comments made by persons closely involved in employment decisions.  King v. United

States, 553 F.3d 1156, 1161 (8th Cir. 2009) (citation omitted).  In contrast, stray remarks

in the workplace, comments by non-decisionmakers, or statements by decisionmakers that

are unrelated to the employment decision do not constitute direct evidence of employment

discrimination.  Quick v. Wal-Mart Stores, Inc., 441 F.3d 606, 609 (8th Cir. 2006).

When a plaintiff lacks direct evidence of discrimination, however, Minnesota

courts follow the familiar burden-shifting analysis set forth in McDonnell Douglas Corp.

v. Green, 411 U.S. 792, 802–03 (1973), to analyze indirect evidence of discrimination.

Hilde, 2015 WL 467749, at *3.  Under the McDonnell Douglas framework, the plaintiff

initially must establish a prima face case of discrimination.  Id. (citing McDonnell

Douglas, 411 U.S. at 802).  The burden of production then shifts to the defendant

employer to articulate a legitimate, nondiscriminatory reason for its actions.  Id.  If the

defendant offers a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to put forth evidence showing the defendant's proffered explanation is a pretext for unlawful discrimination.  Id. (citing McDonnell Douglas, 411 U.S. at 804).  A plaintiff may establish sufficient evidence of pretext by showing that the employer's explanation is either "unworthy of credence" because it lacks any factual basis, or by persuading the court that an unlawful reason "more likely motivated the employer."  Id. (quoting Torgerson, 643 F.3d at 1047).

The MHRA, Minn.Stat. § 363A.08, subd. 2, prohibits an employer from making adverse employment decisions against an employee based on the employee's age.   In general, claims arising under the MHRA are considered under the same analysis as claims arising under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 623(a)(1).  Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1138 (8th Cir. 2006).  The Court therefore relies on decisions under both the MHRA and the ADEA in analyzing Plaintiff's claim.  See Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 795-96 (8th Cir. 1996) (noting that courts may look to federal cases interpreting analogous federal anti-discrimination statutes for guidance in cases arising under state anti-discrimination statutes) (citation omitted).

The Eighth Circuit Court of Appeals has noted that "'circumstances that rise to a constructive discharge – that is, one in which an employee had no choice but to quit because of the employer's actions – are also considered an adverse employment action,'" because the actions are not viewed as truly voluntary.  Tusing v. Des Moines Indep.

Cmty. Sch. Dist., 639 F.3d 507, 521 (8th Cir. 2011) (quoting Fenney v. Dakota, Minn. &

E. R. Co., 327 F.3d 707, 717 (8th Cir. 2003)).   A plaintiff alleging constructive discharge

must show that:  (1) a reasonable person in his situation would find the working

conditions intolerable, and (2) the employer intended to force him to quit.  Fercello v.

County of Ramsey, 612 F.3d 1069, 1083 (8th Cir. 2010) (citing Carpenter v. Con–Way

Cent. Express, Inc., 481 F.3d 611, 616 (8th Cir. 2007)).  In addition, the employee must

give the employer a reasonable opportunity to resolve a problem before quitting.  West v.

Marion Merrell Dow, Inc., 54 F.3d 493, 497 (8th Cir. 1995).

   To prove the employer's intent, Stark may use direct evidence or show that Nestlé

could have reasonably foreseen that Stark would quit as a result of Nestlé's actions.

Fercello, 612 F.3d at 1083.  The intolerability of working conditions is judged by an

objective standard, not the employee's subjective feelings.  Sanders v. Lee Cnty. Sch.

Dist. No. 1, 669 F.3d 888, 893 (8th Cir. 2012).  While the Eighth Circuit has not

enumerated specific factors required for finding constructive discharge, the court has

noted seven factors considered singly, or in combination, by two other circuits:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities;
> (4) reassignment to menial or degrading work; (5) reassignment to work
> under a younger supervisor; (6) badgering, harassment, or humiliation by
> the employer calculated to encourage the employee's resignation; or (7)
> offers of early retirement on terms that would make the employee worse off
> whether the offer was accepted or not.

Id. at 893 n.3 (citing Barrow v. New Orleans S.S. Ass'n, 10 F.3d 292, 297 (5th Cir.

1994); Logan v. Denny's, Inc., 259 F.3d 558, 569 (6th Cir. 2001) (adopting the Fifth

Circuit's factors)).

Here, for purposes of Nestlé's summary judgment motion, the Court concludes that Stark has presented direct evidence that unlawful discrimination was a motivating factor in his alleged constructive discharge from Nestlé. Agan, Gilbert, and Catlett-King were all involved in the decisionmaking process concerning the alleged constructive discharge. Stark has produced evidence that his regional manager, Agan, commented to the Minnesota DSLs that he was "alarmed" by the "age and tenure" of the DSLs – a group that included Stark, an employee in his 50s, with over 20 years' experience – and instead preferred to hire young people straight out of college. (Spore Dep. 176, 184, 226, 265, Ex. 10 to Lienemann Decl. [Doc. No. 47]; Stark Dep. 202, Ex. 11 to Lienemann Decl. [Doc. No. 47]; Jackson Dep. 16, Ex. 5 to Lienemann Decl. [Doc. No. 47].) While Agan disputes having made such comments (Agan Dep. 42, Ex. 1 to Lienemann Decl. [Doc. No. 47]), on summary judgment, the Court considers the facts in the light most favorable to Stark, the nonmoving party. Stark has also presented evidence that HR representatives were present when Agan is alleged to have made the age-related comments and said nothing in response. (Spore Dep. 177, 265, Ex. 10 to Lienemann Decl. [Doc. No. 47]; Stark Dep. 202-06, Ex. 11 to Lienemann Decl. [Doc. No. 47].) Aside from the age-related comments, Agan also humiliated Stark in group meetings, accusing him of "sucking up," or branding him "teacher's pet," when Stark merely complied with requested procedures. (Stark Dep. 295-97, Ex. A to Somermeyer Aff. [Doc. No. 39].)

In addition, Stark has produced evidence showing that his immediate supervisor,

Gilbert, berated and harassed him on a daily basis, telling him that he lacked the right

skill set, and even if older managers could be "trained," they would not be able to

"maintain." (Stark Dep. 165-67, 299-300.)  Other employees overheard Gilbert speak to

Stark in a demeaning tone of voice, heard Gilbert lament his inability to get Stark's

subordinates to "throw him under the bus," and overheard Gilbert generally comment

about older employees' injuries, inefficiency, and inability to change. (Sampson Dep. 7,

9, 17-18, Ex. 9 to Lienemann Decl. [Doc. No. 47].)  Moreover, Nestlé's Safety, Health

and Environmental Manager spoke at meetings with DSLs about "performance managing

out" habitually injured workers, referred to Nestlé's aging workforce, and commented

that older workers were more likely to be injured. (Spore Dep. 210, 215-16, Ex. 10 to

Lienemann Decl. [Doc. No. 47]; Jackson Dep. 14, Ex. 5 to Lienemann Decl. [Doc. No.

47].)

          Stark has also produced evidence from which a jury could conclude that Nestlé's

HR employees, particularly HR Director Catlett-King, actively participated in plans to

"performance manage out" older employees, including Stark and Spore.  In October 2011,

Catlett-King participated in a contingency-planning meeting in which three older DSLs,

including Stark and Spore, were identified as potentially exiting employees for 2012.

(10/16/11 Email, Ex. 13 to Lienemann Decl. [Doc. No 47].)  Following a December 2011

so-called calibration meeting, Catlett-King, Agan, and Gilbert identified Stark as a

potential temporary replacement for Spore.  (Email of 1/10/12 at NES00006663, Ex. 17 to

Lienemann Decl. [Doc. No. 47].)  Catlett-King further suggested that because Nestlé did

not appear to have an "immediate exit plan" for Stark, his performance rating should be adjusted up – suggesting that the manipulation of performance ratings was directly related to Nestlé's "exit plans " for Stark.  (Id. at NES00006661.)  Certainly, Stark has produced evidence showing that his work met objective performance targets.  (Nestlé Target Tracker Chart, 2/12, Ex. 22 to Lienemann Decl. [Doc. No. 47]; D4G Chart, 11/11, Ex. 23 to Lienemann Decl. [Doc. No. 47].)  Regardless of Catlett-King's equivocation about the meaning of the word "exit" (Catlett-King Dep. 64-65, Ex. 3 to Lienemann Decl. [Doc. No. 47]), the evidence also shows that Stark had no intention of voluntarily ending his employment with Nestlé, nor did Spore, for whom Nestlé planned an "exit" by April 1. (Email of 1/10/12 at NES00006663, Ex. 17 to Lienemann Decl. [Doc. No. 47].)

In addition, Stark has produced evidence demonstrating that he complained to HR about his concerns of age discrimination.  (Stark Dep. 171-72, 307-11, 319-20, Ex. A to Somermeyer Aff. [Doc. No. 39].)  Specifically, Stark told HR his concern that he was being "performance managed out" and that Gilbert and Agan treated him differently than younger managers with respect to market tours.  (Id.)  Internally, HR employee Jaynes conceded the validity of some of Stark's concerns.  (Ex. 8 to Jaynes Dep., Ex. E to Somermeyer Aff. [Doc. No. 39].)

As noted, Stark has also produced evidence suggesting that the criticism he received from  Agan and Gilbert following his two market tours and from his year-end review was unfounded.  (See Stark Decl. ¶ 10 [Doc. No. 46].)  After the second market tour, Gilbert told Stark and Catlett-King that he was placing Stark on a PIP and giving

Stark the lowest possible year-end performance rating – a rating that would deprive Stark

of any bonus whatsoever.  (Email of 2/6/12, Ex. 18 to Lienemann Decl. [Doc. No. 47];

Stark Dep. 145-47 & Stark Ex. 3, Ex. A to Somermeyer Aff. [Doc. No. 39].)  Although

Gilbert claims that he never actually placed Stark on a PIP, the facts show that he

intended to do so and that he told Stark that he was placing him on a PIP.  Stark contends

that he was never informed that he was ever taken off the PIP.  (Stark Decl. ¶ 6 [Doc. No.

46].)  In addition, when Stark asked about the repercussions of the PIP to his candidacy

for a different internal position, Gilbert told him that he was required to tell the other

hiring manager about his poor performance review, likely foreclosing the other position at

Nestlé.  (Id. ¶ 7.)

Finally, after Stark complained about his year-end performance review, Nestlé

decided to offer an upward adjustment to all DSLs receiving a rating of 4 or 5.  (Catlett-

King. Decl. ¶¶ 8-9 [Doc. No. 40].)  Stark was not apprised of this decision, however, until

one week after he had resigned.  (See Stark Dep. 257 & Stark Ex. 16, Ex. A to

Somermeyer Aff. [Doc. No. 39].)  Catlett-King testified that she and Jaynes, also in HR,

spoke with Gilbert and Agan about Stark's allegations.  (Catlett-King Dep. 157-58 &

Catlett-King Ex. 15, Ex. F to Somermeyer Aff. [Doc. No. 39].)  Although Nestlé

apparently contends that it internally decided to adjust the performance ratings prior to

Stark and Spore filing charges of age discrimination with the MDHR (Catlett-King Dep.

168-70, Ex. F to Somermeyer Aff. [Doc. No. 39]), Nestlé did not actually send Stark his

bonus until after he filed the charge.  (Catlett-King Decl. ¶10 [Doc. No. 40].)

All of this proffered evidence could support a finding by a reasonable fact finder that age actually motivated the adverse employment action alleged in this case.[4]  Given the submitted evidence of age animus, Stark's complaints, and Nestlé's responses, a reasonable jury could find that the allegedly continuing harassment and management's active involvement rendered Stark's working conditions intolerable and forced him to quit.  Although Defendant has presented evidence that contradicts Stark's evidence regarding Defendant's motives, such evidence creates an issue at trial but does not entitle Defendant to summary judgment.

Finally, Defendant argues that even if Stark can establish the elements of constructive discharge, his claim fails because he refused to give Nestlé a reasonable opportunity to correct the allegedly intolerable conditions before quitting.  (Def.'s Mem. Supp. Mot. for Summ. J. at 33-34 [Doc. No. 38].)  The Court disagrees.  Stark conferred with HR and with Gilbert about his concerns on several occasions.  (See Stark Dep. 171-72, Ex. A to Somermeyer Decl. [Doc. No. 39]; Sampson Dep. 16-17, 29, Ex. 9 to Lienemann Decl. [Doc. No. 47].)  He challenged his performance rating of 5.  (Ex. 3 to

---

[4] Even if Stark's evidence in opposition to summary judgment is merely considered indirect evidence, the Court finds that he has established a prima facie case, creating a presumption of discrimination, which, under the McDonnell Douglas test, Nestlé could rebut by showing a legitimate non-discriminatory reason for its employment actions. Although Nestlé focused its summary judgment motion on whether the employment action was adverse, and did not expressly articulate a legitimate non-discriminatory reason for its actions, assuming that it had done so, Stark has nonetheless submitted evidence creating an issue of materially disputed fact as to whether any such legitimate reason was pretextual.

Stark Dep., Ex. A to Somermeyer Aff. [Doc. No. 39].)  Finally, when he learned that he

was being placed on a PIP, from which he believed it would be impossible to recover, and

received an abusive email from Gilbert, he resigned.  (Stark Dep. 131-32, Ex. A to

Somermeyer Aff. [Doc. No. 39].)  Moreover, after his resignation, he responded to

Nestlé's overture for assistance in the investigation of his claims.  (Id. at 257-60.)  Nestlé,

however, refused Stark's request to bring a witness of his choice to any meeting with

Nestlé, which caused Stark to decline to meet with them.  (Id. at 258, 260.)  Accordingly,

the Court finds evidence in the record showing that Stark provided Nestlé with

opportunities to rectify the allegedly intolerable working conditions.

Accordingly, for all of the foregoing reasons, the Court finds that material issues

of disputed fact remain and that summary judgment is inappropriate.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

Defendant's Motion for Summary Judgment [Doc. No. 36] is **DENIED**.


Dated:    March 2, 2015

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Court Judge